NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF-RE-
SPONDENT, v. JOSEPH W. BOWLEY, DEFENDANT-
APPELLANT.

Argued May 20, 1958—Decided June 27, 1958.

550

*Mr. James M. Davis, Jr.,* argued the cause for defendant-appellant (*Messrs. Powell & Davis,* attorneys).

*Mr. Robert W. Criscuolo* argued the cause for plaintiff-respondent (*Messrs. Parker, McCay & Criscuolo,* attorneys; *Mr. Robert W. Criscuolo,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is a condemnation case. Defendant Bowley appeals and tenders the question whether the trial court erred in excluding a contract of sale between him and one T. P. Morgan relating in part to the subject lands. We certified the matter on our own motion before consideration of it by the Appellate Division.

The declaration of taking was filed on September 19, 1955. For several years prior thereto, it was known that plaintiff planned to acquire a right of way for an extension to connect its turnpike with the Pennsylvania Turnpike. The alignment was officially declared on April 14, 1954.

The Morgan contract is dated April 10, 1953. The agreement provided that Morgan would pay Bowley $5,000 per acre for an assemblage of 400 acres provided Bowley could deliver title 60 days after the official declaration of the permanent alignment of the turnpike extension, the $2,000,000 purchase price to be paid in cash at that time. It expressly stipulated that if Bowley could not deliver "because of the alignment of the New Jersey Turnpike Extension the said Joseph Bowley will not be penalized or

the said T. P. Morgan will not be bound by this agreement," in which event Morgan's deposit of $1,000 would be returned. According to Bowley, the deposit was made in the form of ten bills of $100 denomination, and was returned in the same form some time after the declaration of the permanent alignment made it evident that 400 acres could not be assembled.

Bowley urges (1) that the contract should have been admitted as evidence of the value of the lands taken and damaged by the taking and (2) "there was an incidental taking of a contract along with and as part of his land," for which compensation should be allowed.

The contract prescribed the area within which the 400 acres were to be assembled. Bowley points to seven parcels therein which he believes he could have acquired. They, together with his own holdings, totaled 496.12 acres. The turnpike right of way embraced 72.13 acres and hence if it should appreciably invade the area, there could be no assemblage of 400 acres. In fact the right of way as finally fixed roughly bisected the specified area.

That Bowley knew at the time of the Morgan contract (April 10, 1953) that the right of way would probably thus prevent an assemblage of 400 acres seems indisputable. On October 24, 1952 Bowley acquired two parcels constituting the Simpkins Farm. On the same day he conveyed the southerly portion of the farm to Markheim-Chalmers-Ludington, Inc. In his deed Bowley employed a description which made specific reference to the proposed southerly line of the turnpike extension and conveyed the lands south of that line. The parties simultaneously made a side agreement for an additional payment or refund, as the case might be, if the turnpike line as finally fixed should enlarge or reduce the total of 130.021 acres which the deed purported to convey. As matters developed, the final line approximated the one used in the deed and reduced the tract by 27.154 acres, which were reconveyed to Bowley on August 17, 1955, and became part of his holdings of 204.15 acres as of the date of declaration of taking.

There were multiple owners of some of the seven parcels referred to above. At the time of the trial of this case, one parcel was subject to an action to quiet title, the ultimate issue being adverse possession. Except for the acquisition of a tract of 45 acres (not contiguous to his own lands) on August 5, 1953, Bowley's efforts as of the date of declaration of permanent alignment (April 14, 1954) had yielded but one written agreement covering 11.04 acres. Nothing would be gained by recounting his testimony as to sundry conversations, negotiations and oral understandings. It is sufficient to say that the record is barren of evidence of the availability to Bowley of the required acreage. In fact the central theme of his testimony is that he was restrained from conclusive steps by uncertainty as to whether the right of way would render his efforts futile.

Morgan did not testify. There was no proof of his ability to perform. He was described by Bowley as a prominent Texas oil man and racetrack figure.

Plaintiff points to circumstances suggesting that the contract was made in bad faith for the very use to which Bowley here sought to put it. But the ruling below did not rest upon such factual determination, and we here accept the premise that Morgan existed and wanted to acquire a tract of 400 acres.

I.

The first question is whether the Morgan contract should have been admitted to evidence the value of the Bowley parcel.

Plaintiff took 45.35 acres of defendant's 204.15 acres. The major taking consisted of the right of way along the southerly line of the property. A strip running northerly from the right of way was also taken for an access road, resulting roughly in an equal division of the remainder of defendant's tract.

The experts produced by both sides agreed that, although the lands were devoted to agriculture, their highest and best use was industrial. They differed as to whether that use

was for heavy or light industry, but agreed that assemblage was an important factor. All of the experts found damage to the remaining lands by virtue of the taking. Plaintiff's experts valued the lands before taking at $3,000 per acre while defendant's experts placed the figure at $4,500 and $4,575.

Both parties accept the principle stated in *United States ex rel. and for Use of Tennessee Valley Authority v. Powelson,* 319 *U. S.* 266, 275–276, 63 *S. Ct.* 1047, 87 *L. Ed.* 1390 (1943):

"An owner of lands sought to be condemned is entitled to their 'market value fairly determined.' *United States v. Miller,* 317 *U. S.* 369, 374, 63 *S. Ct.* 276, 280, 87 *L. Ed.* 336, [147 *A. L. R.* 55]. That value may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted. [*Mississippi & R. River*] *Boom Co. v. Patterson,* 98 *U. S.* 403, 25 *L. Ed.* 206; *McCandless v. United States,* 298 *U. S.* 342, 56 *S. Ct.* 764, 80 *L. Ed.* 1205. In that connection the value may be determined in ·light of the special or higher use of the land when combined with other parcels; it need not be measured merely by the use to which the land is or can be put as a separate tract. *McGovern v.* [*City of*] *New York,* 229 *U. S.* 363, 33 *S. Ct.* 876, 57 *L. Ed.* 1228, 46 *L. R. A. N. S.* 391. But in order for that special adaptability to be considered, *there. must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future. Olson v. United States,* 292 *U. S.* 246, 255, 54 *S. Ct.* 704, 708, 78 *L. Ed.* 1236, 1244. *In absence of such a showing, the chance of their being united for that special use is regarded 'as too remote and speculative to have any legitimate effect upon the valuation.' McGovern v.* [*City of*] *New York, supra,* 229 *U. S.* at *page* 372, 33 *S. Ct.* [876], *page* 877, 57 *L. Ed.* 1232, 46 *L. R. A. N. S.* 391." (Emphasis added)

The question is whether the Morgan contract is evidential of the value of the Bowley tract under the approach there stated.

The trial court conducted a preliminary hearing in the absence of the jury to determine in the exercise of a sound discretion whether the proof was too remote and speculative for submission to the jury. *State by State Highway Commissioner v. Gorga,* 26 *N. J.* 113, 117 (1958); *Ringwood Co. v. North Jersey District Water Supply Commission,* 105 *N. J. L.* 165, 172 (*E. & A.* 1928); 9 *Wig-*

*more, Evidence* (*3d ed.* 1940), § 2550, *p.* 501. He found the offer to be inadequate, and we agree.

■ Proof of the sale of the subject property to the condemnee may be admissible under appropriate circumstances to evidence value. See *New Jersey Highway Authority v. Rudd,* 36 *N. J. Super.* 1 (*App. Div.* 1955). Here we have something less—a contract to sell.

Most jurisdictions reject proof of mere offers to purchase the condemned lands. *In re Port of New York Authority,* 28 *N. J. Super.* 575, 583 (*App. Div.* 1953); 4 *Nichols, Eminent Domain* (*3d ed.* 1951), § 12.311 [2], *pp.* 54–55; 1 *Orgel, Valuation Under Eminent Domain* (*2d ed.* 1953), § 148, *p.* 623; *Jahr, Eminent Domain* (1953), § 145, *p.* 223; *Annotation,* 7 *A. L. R.* 2d 781, 785, 823 (1949); *Annotation,* 84 *L. Ed.* 248 (1940). Several considerations differentiate the probative force of an offer from that of a consummated sale. Offers, especially oral ones, may be glibly made without serious intention or the required resources. The offeror may entertain contingencies and terms reserved for later serious discussion. The offeror is likely to be unavailable for examination as to his intentions, ability to perform, or unusual motivations for seeking the property. The area for collateral inquiry is far broader than in the case of actual sales, as is also the opportunity for collusion and fraud. For such reasons, the great weight of authority declines to accentuate the element of speculation which inevitably attends an inquiry into value. Even in jurisdictions where offers may be shown, proof would probably be required which is here lacking, at least in part. Thus in *City of Chicago v. Harrison-Halsted Building Corp.,* 11 *Ill.* 2d 431, 143 *N. E.* 2d 40, 45 (*Sup. Ct.* 1957), the court laid down the test that the "offer must be made in good faith, by a man of good judgment, acquainted with the value of the real estate and of sufficient ability to pay" in "cash."

So also it has been held that an option (on comparable lands) not binding on the purchaser may not be proved. *In re Housing Authority of Newark,* 126 *N. J. L.* 60, 64

(*E. & A.* 1941). Plaintiff says the Morgan contract is no more than an option. But in form, at least, it purports to bind Bowley to acquire the acreage without reference to cost (Bowley testified it was a "gamble") and Morgan to buy at the stipulated price, subject to the escape clause relating to the permanent location of the right of way.

■ There seems to be little authority with respect to the admissibility of a binding contract when offered by the condemnee. *United States v. Certain Parcels of Land,* 144 *F. 2d* 626, 155 *A. L. R.* 253 (3 *Cir.* 1944); *Annotation,* 155 *A. L. R.* 262, 265 (1945); 1 *Orgel, supra,* § 148, *p.* 627. We need not consider the competency of a firm, unconditional agreement since the insufficiency of the one here involved is patent. Morgan did not agree to pay $5,000 per acre for Bowley's property alone. He attached an extraordinary condition, *to wit,* the assemblage of 400 acres within a tightly prescribed area. He would pay the stipulated price only to one who successfully carried the burden and risk of tieing together a substantial number of parcels in diverse ownerships. Performance was so beset with contingencies that upon the record here made it would have been sheer speculation for a jury to give it probative effect. *Cf. In re Morris & Cummings Dredging Co.,* 96 *N. J. L.* 248, 251 (*E. & A.* 1921). In the last analysis, the issue is whether the contract wouuld reasonably show what a willing buyer would pay a willing seller for the Bowley acreage on the basis of a reasonable probability of its being combined with other tracts in the reasonably near future. The contract in no way discloses what Morgan would have paid for the Bowley lands alone on that basis and we fail to see how a jury could have been aided by it in the inquiry. Hence the trial court's ruling was correct.

## II.

As stated above, defendant here urges the contract should have been admitted (wholly apart from its evidential worth with respect to the value of the Bowley lands) for the jury's determination of additional damages resulting from the

deprivation of defendant's opportunity to perform the contract. He says the contract became "a feature of the land itself," which was incidentally taken "along with and as part of the land," without due process of law and in violation of *Article* I, *par.* 10 of the *Constitution of the United States* prohibiting a state from impairing the obligation of contract.

Plaintiff seems correct in saying that the issue here pressed contradicts defendant's position at the trial. There defendant said "it is not my contention that simply because the contract goes into evidence, that the jury is to compensate Dr. Bowley for the loss of the contract." He added the contract "shows Dr. Bowley's plan, and intends [*sic*] to show the value of his lands as of 1953 as part of that plan" and that the extension "cut off his land from the opportunity that it had." At best, the position at the trial was obscure, but granted the scope now urged, it is without merit.

 The power of eminent domain of course is not restrained by the existence of a contract of sale and the exercise of that power does not violate the constitutional guaranty against state action impairing the obligation of contract. *City of Cincinnati v. Louisville & Nashville Railroad Company,* 223 *U. S.* 390, 32 *S. Ct.* 267, 56 *L. Ed.* 481 (1912).

 The question, rather, is whether there is a right of compensation for the loss of the contract. A distinction has been drawn in general terms between a case in which the condemnor acquires and takes over a contract and a case in which the taking of the property frustrates the performance of a contract, compensation being allowed in the former instance and denied in the latter. 1 *Orgel, supra,* § 76, *p.* 330; *Jahr, supra,* § 114, *p.* 157.

 The Morgan contract in no sense became part of the land. It did not further any existing enjoyment or utilization of the land, nor was the land devoted to an activity which would result in the performance of the contract. *Cf. City of Trenton v. Lenzner,* 16 *N. J.* 465 (1954),

*certiorari* denied 348 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* 757 (1955). The land was a farm. The contract was nothing more than a personal right of Bowley, indistinguishable from the right which a stranger to the lands would have had if Morgan had contracted with that stranger for the acquisition and sale of the acreage. Hence we fail to discern how it can be said the contract was attached to the land and condemned with it.

Nor did plaintiff intend to take over the Morgan contract and to appropriate to itself the benefits of that contract. It had no desire to assemble and sell lands to Morgan; its purpose was to build a turnpike extension. In fact, the contract was no longer in existence at the time of the declaration of taking, for Bowley had already terminated it by returning the deposit, and in any event the contract by its terms was then beyond performance.

Nor was there any proof as to the value of the contract or that anyone would have paid a farthing to take over what Bowley acknowledged to be a gamble.

▋ If defendant's point is that the performance of the contract was frustrated and that damages should be paid for such interference, it would seem sufficient to state an obvious proposition. No one, be he the owner of the lands or not, may contract for their sale with knowledge of a proposed public improvement upon the express stipulation that performance will be excused if the lands are condemned, and then assert that the advent of the very public improvement contemplated in the contract constitutes an actionable interference with it. Whatever may be the proper scope of the doctrine that the condemnor is not liable for the frustration of the performance of a contract, the agreement here involved easily falls within the doctrine.

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, FRANCIS and PROCTOR—5.

*For reversal*—Justice WACHENFELD—1.