LARIO, J. T. C.
These are consolidated local real property appeals from county board judgments affirming assessment on premises known as Block 1, Lots ID and IE, of Land — $1,230,000; Improvements— $670,000; Total — $1,900,000, for the tax years 1978 and 1979.
The subject property, consisting of 41.9 acres, is operated in an industrial chemical plant and tank farm. It is located east of Mantua Avenue and north of Industrial Road at the point where the Mantua Creek enters the Delaware River. The area is a mixture of commercial and industrial properties, with some residential development. It has frontage on Mantua Creek of 1,350 feet, of which approximately 725 feet is dock frontage, navigable for barges. The creek has a channel draft of 40 feet. The frontage on the Delaware River is 730 feet and it is in close proximity to the channel of the river. The topography is fairly level and above flood elevation, with a gradual slope north into the Delaware River. All of the subject property is upland of the high-water line. It contains a wood dock and a combination of interlocking steel and wood bulkhead along the Mantua Creek frontage. There is rail into the property and it is improved with electricity, lacking access to public gas, water and sewerage lines. The remaining improvements essentially consist of a two-story office building, garage, pumphouses and 15 storage tanks having a storage capacity of approximately 6,665,000 gallons. The industrial character and use of the existing improvements are permitted by the present zoning which is “M Manufacturing District.”
Plaintiff presented two experts; the first valued the subject property at $625,000 and the second concluded it to be worth $1,160,000; whereas, the defendant’s expert testified to an overall market value of $1,947,000.
Plaintiff’s first expert was an employee of a large industrial-commercial real estate company from Philadelphia, doing business mainly in the Philadelphia area. He did not attempt to appraise the land and improvements separately, arriving at his opinion of total value of $625,000 by relying solely upon his market approach.
*259 He stated that his firm was given a listing for the sale of the subject property in 1976 for a sale price of $1,500,000. His conclusion of value was based upon the fact that during the four years of the property’s listing for sale he received but three offers to buy, the last allegedly resulting in an agreement. He claimed that his firm widely advertised the property’s availability, sending out 10,000 brochures on two different occasions— 6,000 in about June 1976 and 4,000 about one year thereafter. From 1976 to 1980, the firm had approximately 25 to 30 prospective purchasers who were in the chemical and tank storage business. During this time the firm received two offers: one for $1,100,000 and the other for $1,300,000. However, he claimed that after the prospective purchasers calculated the costs of converting to their respective needs, both withdrew their offers.
The latest offer, which was received at about the end of 1979, was for $625,000 from Essex Chemical Company, plaintiff’s neighbor, with whom it has easement agreements and use of barge facilities and other close relationships, the exact nature of which were not fully explained. He claimed that plaintiff requested him to attempt to secure $850,000, but when he was unable to get Essex Chemical to increase its offer, plaintiff’s executive vice-president agreed to the $625,000 offer and they were waiting for a formal agreement of sale which was being prepared by plaintiff to be executed.
Plaintiff’s second expert valued the subject property at: Land —$670,400; Improvements — $489,600; Total — $1,160,000. Defendant’s expert valued the subject property at: Land — $1,257,-000; Improvements — $690,000; Total — $1,947,000. Both of these experts arrived at their respective land values by reliance upon the market approach and they concluded their respective improvement values by the cost, less depreciation method.
Plaintiff’s second expert relied upon eight land sales for his comparable properties, and based thereon, he arrived at an average per-acre value of $16,000. Defendant’s expert cited six sales upon which he relied to arrive at his per-acre value of $30,000.
*260 Both of the latter experts were reasonably close in their depreciated improvement values, with the exception of the value of the 15 tanks. Plaintiff’s expert valued the tanks at $305,131 to give him a total improvement value of $489,188; whereas, defendant’s expert valued the tanks at $516,200 for a total improvement value of $690,000.
In support of its position that the alleged agreement entered into between plaintiff and Essex Chemical is admissible into evidence and to be given consideration, plaintiff claims the recent amendment to N.J.S.A. 2A:83-1 (L. 1979, c. 114, § 14, eff. July 1, 1979) liberalized the rules of evidence to the extent that real estate appraisers may now testify to, and rely upon, agreements of sale to support their opinion of value.
A study of the history of this statute and its recent amendment fails to disclose any facts or legal basis to support plaintiff’s conclusion.
In Essex Cty. Park Comm’n v. Brokaw, 107 N.J.L. 110, 150 A. 387 (E. & A. 1930), our then highest court held that an expert real estate witness, whose only knowledge of value was based upon comparable sales information gleaned from others or from public records rather than direct personal knowledge of such sales, was not qualified by reason of the hearsay nature of his knowledge.
The practical effect of the Brokaw rule was to preclude otherwise competent witnesses from testifying in proceedings involving the value of lands unless they had actually been involved in the sales of the comparable property. Shortly after this decision, and as a result thereof, L. 1931, e. 229 (now found in N.J.S.A. 2A:83-1) was adopted, which provides in substance that any witness in a tax assessment or condemnation case shall be competent to testify as to sales of comparable property on the basis of information obtained from the owner, seller, purchaser, lessee or occupant of said land or brokers familiar with said sales.
Recently, in N.J. Sports & Expo. Auth. v. Cariddi, 164 N.J.Super. 127, 395 A.2d 895 (1978), aff’d, 84 N.J. 102, 417 A.2d 529 *261 (1980), our Appellate Division held (at 129, 130, 395 A.2d 895) that an expert “may properly cite an attorney participating in the transaction as a source of confirmation of a comparable sale used by the expert in arriving at his valuation of the subject property.” Id. at 129, 130, 395 A.2d 895, footnote omitted.
After the creation of this court[1] this statute was amended by the adoption of L. 1979, c. 114, § 14. The only pertinent changes made therein were to include any action or proceeding in the Tax Court; testimony concerning sale of “improvements,” and the Legislature confirmed the Appellate Division’s holding in N.J. Sports, supra, by adding “attorneys to the class of those to whom the statute applies by its specific terms presumably to conform to the standard practice of relying on attorney certifications. L. 1979, c. 114, § 14.” N.J. Sports & Expo. Auth. v. Cariddi, supra, 84 N.J. at 106, 417 A.2d 529 (1980). It also added an additional clause regarding information obtained from recorded instruments of conveyance.
The testimony permitted by this statute, as amended, is made competent and permissible only; it in no way affects the weight of the evidence. Contrary to plaintiff’s position, nowhere in said amendment is there any reference to agreements of sale, nor can there by any such inference drawn therefrom.
Since plaintiff’s first witness was actually involved in the transaction between plaintiff and Essex Chemical, his testimony was not hearsay and, even under the Brokaw rule, it was admissible if otherwise qualified. Therefore, under the facts relating thereto, this statute is not applicable.
The issue raised by this witness’ testimony is whether the aforesaid transaction, which involves the very property under appeal, is entitled to any probative consideration.
While the selling price of a consummated sale of any real property under valuation review is a guiding indicium of its fair value, L. Bamberger & Co. v. Tax Appeals Div., 1 N.J. 151, 153, *262 62 A.2d 389 (1948), the factors surrounding said sale must be weighed and appraised for special circumstances tending to increase or depress the sales price in derogation of its true value. Rek Investment Co. v. Newark, 80 N.J.Super. 552, 560, 194 A.2d 368 (App.Div.1963).
However, the Essex Chemical transaction under consideration is neither a consummated sale nor a firm unconditional agreement to sell and purchase. It is quite evident from the testimony of this witness that the alleged agreement was to be reduced to writing and, until executed, is not binding upon the parties. Although several months had elapsed between the time plaintiff allegedly agreed to sell and the date of this trial, all of the terms and conditions of the proposed sale still had not been set forth in a written agreement; therefore, neither the appraisers nor this court could scrutinize the agreement to ascertain the weight to be afforded to it.
The alleged agreement not having been reduced to a binding agreement of sale with all its terms and conditions being made known, is too remote and too speculative to be evidential of the value of the subject property; therefore, no probative weight may be given to it.
Likewise, very little probative weight is ascribed to the listing agreement of $1,500,000 and the other two offers received thereunder. In the case of In re Port of New York Authority, 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953), the court stated:
It is the general rule that evidence of mere offers or options to sell or purchase similar real properties is not admissible. Essex County Park Comm. v. Brokaw, 107 N.J.L. 110, 150 A. 387 (E & A 1930); cf. Montclair R.R. Co. v. Benson, 36 N.J.L. 557 (E & A 1873). The reasons under setting the rule are expressed in Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903); Erceg v. Fairbanks Exploration Co., 95 F.2d 850 (9 Cir., 1938). Offers to sell made by an owner of the lands to be taken and proximate in point of time might, perhaps, in some circumstances constitute admissions against interest. [At 583, 101 A.2d 365 emphasis supplied].
Our Supreme Court has held that the probative weight attributable to offers differs from that of a consummated sale, stating in N. J. Turnpike Auth. v. Bowley, 27 N.J. 549, 143 A.2d 558 (1958):
*263 Offers, especially oral ones, may be glibly made without serious intention or the required resources. The offeror may entertain contingencies and terms reserved for later serious discussion. The offeror is likely to be unavailable for examination as to his intentions, ability to perform or unusual motivations for seeking the property. The area for collateral inquiry is far broader than in the case of actual sales as is also the opportunity for collusion and fraud. For such reasons, the great weight of authority declines to accentuate the element of speculation which inevitably attends an inquiry into value. Even in jurisdictions where offers may be shown, proof would probably be required which is here lacking, at least in part. Thus in City of Chicago v. Harrison-Halsted Building Corp., 11 Ill.2d 431, 143 N.E.2d 40, 45 (Sup.Ct.1957), the court laid down the test that the “offer must be made in good faith, by a man of good judgment, acquainted with the value of the real estate and of sufficient ability to pay” in “cash.” [At 556, 143 A.2d 558].
The highest and best use of the subject property is its utilization by a business which requires a navigable river channel with barge docking and tank storage facilities. Normally this type of property is not readily available on the market and recently it has been less available by reason of zoning and environmental laws which have become increasingly stringent. However, by reason of its limited type of use, a property such as the subject could very easily be on the market for an extended period of time before a “willing buyer” could be located; therefore, before assigning any reasonable probative value to a sale listing, the market conditions, the business and financial climate, and the method and extent of advertising its availability must be scrutinized closely.
Although the witness stated that his firm mailed brochures, they were sent out on only two occasions over a space of four years. Defendant’s expert, who is affiliated with one of the most active real estate firms in South Jersey, testified that he had no prior knowledge concerning this offer and he did not learn of it until after he became involved in these proceedings, and then not until after discovery proceedings instituted herein. Upon being apprised of this fact, this witness contacted the leading industrial real estate brokers in this area and as a result of his inquiries he was informed that none of them had any prior knowledge concerning same.
I find that there have been insufficient proofs produced to establish that the property was sufficiently marketed and *264 made known to all of the brokers in the area. The subject property being unique, it is questionable whether evidence of the market conditions and financial climate relating to this listing were sufficiently presented to indicate the availability of a willing buyer. Also, it is questionable whether the period of time between its listing in April 1976 and the assessment dates involved herein was sufficient to properly ascribe much weight to the listing price for this type of property.
We must now analyze the proofs of value presented by the remaining two experts.
The subject parcel is located on the channel of the Delaware River and the Mantua Creek and has existing barge docking facilities which, as previously described, make this tract peculiarly unique. It cannot be readily compared to sales of lands of large acreage or to sales of riverfront acreage which either lacked riparian rights or were so located as to be removed from the Delaware River channel or would require extensive land preparation costs in order to utilize facilities for berthing of tankers or docking of barges.
Although all of the eight sales relied upon by plaintiff fronted on the Delaware River, his sales numbered one through four were much larger than the subject property, having 402,243, 529 and 615 acres, respectively. These four sales are contiguous and, although purchased at different dates between 1969 and 1970, they constitute a land assemblage, purchased by the same buyer. Sale number five was not comparable in that it is located in the City of Camden and consists of low ground which is constantly flooding. His sale number six, which is also located in the City of Camden, was owned by the city and was sold to the South Jersey Port Corporation. The circumstances of this sale, which are also applicable to the two South Jersey Port Corporation sales referred to by defendant, indicated that there were other considerations besides the purchase price which included the increase of ratables and business activity for the city. Sale number seven was located in Logan Township, which is rather distant from the subject property and also extremely *265 large in nature, being slightly under 500 acres. Comparable number eight was not a sale but an alleged offering, which consisted of 104 acres and was remotely located from the subject property. There was insufficient information concerning this offering to give it any consideration.
None of plaintiff’s alleged comparables offered the type of barge docking and Delaware River channel access as exists at the subject property.
“The essential criterion in an expert’s decision to use a sale as a comparable is a substantial similarity of conditions.” State v. Probasco, 114 N.J.Super. 546, 552, 277 A.2d 546 (App.Div.1970), aff’d o.b. 58 N.J. 372, 277 A.2d 546 (1971).
Of the sales relied upon by defendant’s expert, his sixth sale is entitled to serious consideration and a great deal of probative weight. It is located on the east bank of the Mantua Creek, directly opposite the subject property. This sale consisted of a four-acre parcel of land with improvements located near the waterfrontage but without actual frontage; however, it contained a barge dock use agreement entitling it to barge loading facilities. The land included approximately 900 linear feet of railroad siding, 1,400 linear feet of seven-inch, high cyclone-type fence and two above-ground vertical steel-welded storage tanks built in 1974. Each tank has a 1,890,000-gallon storage capacity, or a total capacity of 3,780,000 gallons. This sale occurred on December 20, 1977, which is between the two assessing dates herein involved, for a consideration of $2,250,000.
This sale also included an option agreement to purchase part of the adjoining lot, consisting of five acres at $50,000 an acre. Although an option as such is not normally entitled to any probative weight, this option cannot be overlooked. It covers a five-acre tract which is vacant ground, adjoins the subject property and was originally purchased by the seller in September 1973 for $160,000, or $40,000 an acre. The option agreement being $10,000 an acre higher than the 1973 sale, gives added weight to that sale. Although these two tracts together consist of only eight acres, they have many similarities which, together *266 with their proximity to the subject property, give them a high degree of comparability.
As previously stated, the subject property is unusually unique by reason of its location. Plaintiff’s second expert did not appear to be well acquainted with properties in this area, having done only three or four appraisals in South Jersey; this being his first appraisal of land along the Delaware River. The lack of local experience was reflected in the fact that he did not seem to have much personal knowledge of the physical characteristics of the properties which were the basis of the sales relied upon as his comparables.
Conversely, defendant’s expert has appraised many properties in this general area and along the Delaware River, including an appraisal, approximately ten years earlier, of the subject property for plaintiff’s predecessor in title. He possessed familiarity with the physical characteristics, location and zoning of not only the subject property but also of comparable property in the general area. The testimony in this ease reflects that his general knowledge of land values in this area is superior to that of plaintiff’s expert.
The sales price of $40,000 an acre for the four-acre tract sold in 1973, and the overall consideration of $2,250,000 for the adjoining four acres and improvements, amply support the conclusion of land value arrived at by defendant’s expert., Based upon his analysis of these sales, and his testimony as a whole, I find that the land of the subject property has a value of $30,000 an acre.
The divergence between the experts’ improvements valuations is mainly in their respective depreciated values of the 15 vertical storage tanks. The tanks are used for the storage of sulphuric acid and are constructed of welded steel, seven of which were built in 1959, three in 1967 and five in 1972. The sizes of the tanks vary from a capacity of 30,000 gallons to 1,800,000 gallons, with a total capacity of 6,665,000 gallons. The chemicals used to make the sulphuric acid cause the tanks to corrode and deteriorate; also, their storage resulted in the *267 build-up of yellow caking which can only be cleaned in the summer.
From the evidence submitted I find that the tanks have suffered heavy physical deterioration as described by plaintiff’s second expert, and I accept the depreciated values he ascribed to the total improvements, which I round out to $489,000.
I therefore, conclude that the true value of the land and improvements for the years under appeal are as follows:
Land $1,250,000
Improvements $ 489,000
Total $1,739,000
Judgment will be entered accordingly.

N.J.S.A. 2A:3A — 1.