CRABTREE, J.T.C.
This is a consolidated group of local property tax cases wherein 72 condominium owners seek review of judgments of the Passaic County Board of Taxation affirming the 1982 assessments on their units located in a high-rise complex known as Presidential Towers, 180 Lafayette Ave., Passaic, New Jersey.
*410 At issue are the true value of the properties and whether plaintiffs, or any of them, are entitled to statutory relief from discriminatory assessments pursuant to chapter 123. More specifically, the eases involve the application of cash-equivalency principles to property tax assessments.
The subjects of the controversy are 72 units in a 120-unit 12-story high-rise apartment complex converted from rental apartments to condominiums in 1980. All the units are separately assessed for tax purposes in accordance with the New Jersey Condominium Act. N.J.S.A. 46:8B-19.
Under the sponsor’s offering plan the condominium units vary in price according to size, floor level, whether the unit has a balcony, number of bedrooms and baths and exposure (northern or southern). All the units in issue were sold by the sponsor to the individual plaintiffs at various times between May 1981 and April 1982 for prices uniformly discounted 25% from the prices stated in the offering plan.
The seller-sponsor offered purchase-money financing for all sales in an amount equal to 88% of the sale price. While most buyers took advantage of the low down payment of 12%, some made larger down payments. In any event, all buyers gave purchase-money mortgages to the seller. Purchasers in occupancy as tenants at the time of conversion (“insiders”) were allowed mortgages at 9% interest, while purchasers who were not prior tenants (“outsiders”) were permitted mortgages at 10% interest. All mortgages were self-liquidating over 29 years.
As an additional inducement, the seller-sponsor permitted an assumption of the purchase-money mortgages for the first 60 resales, conditioned only upon a 10% principal reduction at the time of resale.
The interest rate charged by institutional lenders in northern New Jersey for mortgage loans on cooperative apartments, condominiums and single-family residences ranged from 17% to 19% around October 1981 and at the times of the sales involved in this proceeding. Mortgage interest rates for new and used *411 residences were between 14% and 15% in April and May of 1981. Some economists and bankers felt that mortgage interest rates peaked in October and November 1981 and that a decline to 13% in the near future was foreseeable. Their prophecy was fulfilled when residential mortgage rates fell to a range of 11% to 13% in November 1983. See The Appraiser January 1984 at 11.
The prevalent mortgage loan position for residential mortgages issued by institutional lenders in northern New Jersey around October 1981 was 75%. Put differently, those lenders required a 25% down payment.
Plaintiffs’ expert confined himself to the market data approach in developing his estimate of the true value of each condominium unit under review. His analysis began with the actual sale price for each unit, which he then adjusted by application of cash-equivalency principles with respect to the purchase-money first mortgage taken by the seller. He posited a prevailing mortgage interest rate of 15%, notwithstanding the fact that actual interest rates on mortgages for residential properties (including condominiums and cooperatives) were substantially higher on the assessing date as well as the sales dates. He acknowledged the temporary character of the higher rates and selected the lower figure as the more enduring level and thus more consistent with the desideratum of assessment stability. He then calculated the present value of the purchase-money mortgages taken by the seller, assigning one value for the 10% mortgages and another value for the 9% mortgages. In all instances he assumed, in the interest of assessment uniformity, a 12% down payment even though some of the plaintiffs paid more. His computations at this point produced discounts from the face amounts of the mortgages of 32% for the 9% mortgages and 27% for the 10% mortgages. The expert’s next adjustment was designed to account for the difference between down payments then required in the marketplace (25%) and the down payment required by the seller with regard to the sales of the subject condominiums (12%). This adjustment took shape as a hypothetical second mortgage, *412 to which he assigned an interest rate of 18%. That rate was selected in accordance with the same principles that led to the expert’s choice of a 15% rate for the first mortgage. The computations under these assumptions produced an additional discount, applicable to all mortgages taken by the seller, of 3%. The total discounts then amounted to 35% for the 9% mortgages and 30% for the 10% mortgages. The expert then added the 12% cash down payment to the discounted value of the purchase-money mortgage, thereby arriving at his final estimate of true valué for each property.
Defendant’s expert, who also confined his analysis to the market data approach, relied almost entirely upon the prices stated in the sponsor’s offering plan in developing his true value estimate. He concluded that such prices represented the market values of the condominium units before adjustments for favorable financing. In his view the 25% discount from the original offering prices, reflected in actual sales of the units, plus an additional 10% constituted an adequate allowance for the financing terms offered by the seller-sponsor. He offered no support, documentary or otherwise, for his conclusions.
The court’s primary duty is to ascertain the true value of the subject condominium units on October 1, 1981. The ultimate fact to be determined is the full and fair value of the property — more specifically, the price a willing buyer would pay a willing seller. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963); Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982); N.J.S.A. 54:4-23.
■[2-4] Market value, a synonym for true value or full and fair value, is defined in the leading authoritative work in the appraisal field as follows:
The most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 33; emphasis supplied]
*413 The concept of cash equivalence, expressed in the quoted passage, implicitly requires that adjustments be made for favorable financing. Comparable sales and, indeed, sales of the subject property, have been rejected as proof of value where the expert failed to account for favorable financing. Petrizzo v. Edgewater, 2 N.J.Tax 197 (Tax Ct.1981); Bloomfield v. Parkway Industrial Center, 3 N.J.Tax 220 (Tax Ct.1981). Where the adjustments have been made and supported by the evidence, however, this court has accepted the cash-equivalence concept, albeit with some modification in the interest of assessment stability. Berkley Arms Apartment Corp. v. Hackensack, 6 N.J.Tax 260 (Tax Ct.1984). In the instant case there is ample evidence to support the cash-equivalence adjustments made by plaintiffs’ expert. The actual interest rates associated with the seller-sponsor’s financing of plaintiffs’ purchases of their units were established, as were the down payment requirements; the prevailing market interest rates were shown along with the down payment required by lending institutions; and the prevailing second mortgage interest rates were proven. No more is required.
The adjustments made by plaintiffs’ expert, including his adjustments for the hypothetical second mortgage, are in accord with recognized appraisal techniques. The Appraisal of Real Estate, supra at 304-307; Crissey, Jr., “Discounting Atypical Real Estate Sales to Cash Equivalencies,” Valuation (Nov.1980) 70-73; Lipscomb, “Discount Rates for Cash Equivalent Analysis,” The Appraisal Journal (January 1981) 23-33; Maes, “The Emergence of Cash Equivalency in Valuation,” Real Estate Review (Fall 1982) 87-90. The court, however, differs with plaintiffs’ expert in two significant respects.
First, the court must reject the expert’s posited interest rate of 15%, which, while selected in the interests of assessment stability in preference to the higher but more volatile, less enduring current rate, is still too high. The credible evidence shows that, at or about the assessing date, leading economists and other knowledgeable observers were *414 predicting residential mortgage interest rates in the 11%-13% range, a prophecy fulfilled not long thereafter. In addition, the court notes that the rates in 1979 and 1980 were in the 11%-12.5% range. It is well settled that true value for property tax assessment purposes must be fairly constant and measured by conditions which, over time, are regarded as stable. Newark v. West Milford, 9 N.J. 295, 88 A.2d 211 (1952); New Brunswick v. Tax Appeals Div., supra. Assessments should not be hostage to volatile fluctuations in the financial markets. Inwood at Great Notch v. Little Falls, 6 N.J.Tax 316 (Tax Ct.1984). Accordingly, I conclude that the first mortgage rate to be employed in this proceeding for purposes of the cash-equivalency calculation is 13%.
Secondly,- the court disagrees with the expert’s bifurcated cash-equivalence adjustments arising from different interest rates offered to the purchasers of the condominium units and predicated upon each purchaser’s status in relation to the unit at the time of condominium conversion. The seller-sponsor offered 9% mortgages to “insiders,” i.e., tenants in occupancy at the time of conversion, and 10% mortgages to “outsiders,” i.e., those purchasers who were not tenants at the time of conversion. It is worthy of note at this juncture that 9% mortgages were offered to all insiders and to them exclusively.
This aspect of the expert’s cash-equivalence adjustments goes to the heart of the concept of assessment equality and uniformity.
It is well settled that property tax assessments must comprehend all interests in the property. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.), certif. den. 62 N.J. 90, 299 A.2d 88 (1972); Tower West Apt. Ass’n v. West New York, 2 N.J.Tax 565 (Tax Ct.1981), aff’d per curiam 5 N.J.Tax 478 (App.Div.1982). Where a tenant occupies a property under a long-term lease at a below-market rental, the leasehold amounts to a partial interest in the property itself and the landlord’s leased fee estate is likewise a partial interest in the property. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax *415 Ct.1980), aff’d o.b. per curiam, 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981); see Irvington v. 1125-1127 Clinton Ave. Associates, 5 N.J.Tax 420, 430 (Tax Ct.1983).
The sales of all the condominium units under review occurred after the effective dates of statutes which afford substantial protection to tenants in possession of rental apartments at the time of conversion of the apartment building to condominiums. These statutes, in addition to creating rights in such tenants, impose severe limits upon the landlord’s capacity not only to sell the condominium units but to continue to deal profitably with the unsold units occupied by pre-conversion tenants. A tenant may not be evicted for three years following conversion, N.J.S.A. 2A:18~61.2(g); a court may authorize as many as five one-year stays of eviction where the landlord has failed to prove that comparable rental housing has been offered (but this may be limited to one one-year stay if the landlord foregoes collection of five months rent), N.J.S.A. 2A:18-61.11; local rent control remains applicable to rented units in an apartment building converted to condominium use, G.D. Management Co. v. Negri, 182 N.J.Super. 409, 442 A.2d 611 (App.Div.1982); and, in a rent-controlled municipality, a property tax increase attributable to condominium conversion may not be passed on to a tenant remaining in possession following conversion even though the rent-control ordinance allows such pass-through. B.H. Associates v. Brudner, 185 N.J.Super. 403, 449 A.2d 23 (Cty.D.Ct.1982), app. dism. 190 N.J.Super. 1, 461 A.2d 753 (App.Div.1983).[1]
These enumerated rights of tenants in possession at the time of condominium conversion are conceptually indistinguishable from the rights of tenants under long-term leases with below-market rents. While in the one case, the rights arise from legislation and in the other from private contract, in both cases the affected property is encumbered by those rights, *416 which also constitute partial interests in the property. Those interests are derivative of the tenants’ relationship to the demised property. In order to determine the true value of each condominium unit purchased by an existing tenant, the value of the latter’s interest must be quantified, and that can only be done through market action. That action can be expressed in a dual pricing structure, as in Briskin v. Atlantic City, 6 N.J.Tax 187 (Tax Ct.1984) (condominium units were sold at one price for “insiders,” at another, higher price for “outsiders”), or, as in the cases before the court, in a differential in financing terms, with a lower interest rate offered to tenants in possession.
Thus, the cash-equivalent sales prices of the units sold with the aid of 9% seller financing are not valid indications of the value of all interests in those units. The value of each unit under review, irrespective of whether a unit was sold to an “insider” or an “outsider,” is to be determined, under cash-equivalency principles, by using the 10% interest rate offered to those purchasers who were not tenants at the time of conversion.
The court concurs in the expert’s normalization of the down'payments at 12% for all units. The use of cash equivalency in tax assessment cases presupposes, among other things, a uniform level of financing. (The credible evidence shows that 88% financing was offered to all buyers, only a few of whom paid more than 12% in cash). The court also concurs in the expert’s use of a hypothetical second mortgage to account for the difference between the 88% financing offered by the sponsor and the 75% financing available in the marketplace.
A brief comment is in order concerning the evidence of defendant’s expert. His reliance upon the seller-sponsor’s offering prices as evidence of true value before cash-equivalence adjustments is unfounded. It is well settled than an offering price is not evidence of value. N.J. Turnpike Authority v. Bowley, 27 N.J. 549, 143 A.2d 558 (1958); In re Port of New York Authority, 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953); Olin Mathieson Chem. Corp. v. Paulsboro, 3 *417 N.J.Tax 255 (Tax Ct.1981). There was not one scintilla of evidence offered in support of his discount for favorable financing. His appraisal and testimony, when compared to the detailed, well-documented presentation of plaintiffs expert, can only be described as ludicrously inadequate. It is difficult to imagine a better case for the application of the salutary principle that the probative value of an expert’s opinion depends entirely on the facts and reasoning which form its foundation. Dworman v. Tinton Falls, supra; Glen Wall Assoc. v. Wall Tp., 6 N.J.Tax 24 (Tax Ct.1983).
The parties will submit computations, pursuant to R. 8:9-3, showing the true value of each property under review, calculated in accordance with this opinion, together with a statement of their views as to the applicability, for each separately assessed unit, of N.J.S.A. 54:51A-6 (formerly N.J.S.A. 54:2-40.4).

The court takes judicial notice that rent control is in effect in the defendant municipality at all times pertinent hereto.