EVERS, J.T.C.
Taxpayer has filed direct appeals, involving claims of overvaluation and discrimination, from assessments of $3,860,500 in 1981, 1982 and 1983 levied against its 5.539-acre tract known as Block 4501, Lot 1. Being vacant land both experts relied on sales of allegedly comparable tracts in arriving at their respective opinions of value. Taxpayer valued the land at $2,435,200 in 1981, $2,800,400 in 1982 and $3,220,500 in 1983. Borough’s expert found values of $3,619,200 in 1981, $3,800,100 in 1982 and $4,000,000 in 1983.
As compared with the cost and capitalization of income approaches to value it is often assumed that the sales approach is the least difficult in application, particularly with respect to unimproved tracts where only the usual adjustments for differences in size, location, topography and time (of sale vis-a-vis assessment dates) need be considered. While such may sometimes be the case the facts surrounding this matter clearly point up the need for appraisers to closely examine all factors; those not readily apparent as well as the obvious; the possible *326 as well as the probable, and as they may apply to not only the parcel under review but to the sold sites with which it is being compared. The facts here present also suggest that such in-depth analysis assumes even greater importance in valuing vacant land where the search for value commences with a finding of the site’s highest and best use as opposed to the valuation of an improved property where highest and best use is often dictated by the existing use.
Being located in Fort Lee the site is situated in one of the premier highrise-apartment communities in the northern part of New Jersey. The borough residents have instant access to New York City by way of the George Washington Bridge which is also the beginning point of Routes 1-95, 80 and 4, all being major traffic arteries. Obviously a view of the New York City skyline is enjoyed by all but particularly by the occupants of highrise structures.
The subject site is zoned R-10 which permits the construction of highrise-residential buildings with the maximum height and number of units dependent upon the size of the lot. The zoning also permits the construction of midrise and single-family dwellings, uses which most likely would never materialize on the site under the circumstances. It has substantial frontage on three streets, is in very close proximity to the George Washington Bridge and is immediately accessible to public transportation facilities. It is generally level, at street grade and has all utilities available. The immediate neighborhood consists of highrise apartments with Mediterranean Towers North and South (containing approximately 1,000 units) nearby.
According to borough’s expert witness there are approximately 125 apartment structures of significance in the borough. It was his opinion however, which opinion is borne out by the record, that the character of highrise buildings has changed from rental to condominium or cooperative form of ownership. As such it was his opinion that the site was most suitable for highrise-residential development in condominium or cooperative *327 ownership. The site is one of four remaining vacant sites in the borough zoned for such use.
Noting that no new highrise-apartment buildings had been constructed in the borough for many years (the proliferation of condominium and cooperative apartment units resulted from conversions of rental apartment buildings) and further noting the rash of office building construction, both facts being supported by the record, it was taxpayer’s expert’s opinion that the highest and best use of the subject tract was for an office building. However, in apparent recognition of the legal restrictions imposed by the zoning ordinance as well as the speculativeness of obtaining a variance from such use restrictions, he valued the tract for highrise-residential use. This apparent inconsistency is understandable.
 As earlier noted the search for value of this site must commence with a determination of its highest and best use. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983) defines highest and best use as:
That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.
Alternatively, that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value. [At 107; emphasis supplied]
Also implied in that definition is that the determination of highest and best use results from the appraiser’s judgment and analytical skill, i.e., that the use determined from analysis represents an opinion, not a fact to be found.
However that is not to say that a mere opinion of highest and best use is acceptable. The weight to be given to an expert’s opinion depends on the facts and reasoning which form the basis of that opinion. Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959). It is not the mere opinion of appraisers as to highest and best use that is important but rather the activities of buyers and sellers in the market place. Without purporting to set forth all of such factors, some of the more significant to be considered in determining highest and best use *328 may be the rezoning of nearby property, growth patterns, change of use patterns and character of neighborhood, demand within the area for certain types of land use, sales of related or similar properties at prices reflecting anticipated rezoning and physical characteristics of the subject and of nearby properties.
It is a generally accepted proposition that property should be valued for tax assessment purposes based upon what was known and reasonably anticipated as of the assessment date and not upon speculation or conjecture. Thus in Highview Estates v. Englewood Cliffs Bor., 6 N.J.Tax 194 (Tax Ct.1983), a claim that an office building market consisted of owner-users based on “after assessment data” as opposed to tenant occupiers was rejected. The court said:
Although borough’s opinion may in the future become fact, as of the dates under consideration herein, that opinion can be viewed only as a prophecy and as premature. [At 200]
However it has been held that where a changing market reasonably requires consideration of an incremental value such consideration will not be rejected solely because the subject property, as of the assessment date, has resisted the changing market conditions. In Center-Whiteman Corp. v. Fort Lee, 4 N.J.Tax 153 (Tax Ct.1982) the court considered testimony that, as of the critical assessment date, in view of the rash of conversions of rental properties to condominium/cooperative owned properties, an unconverted rental property under appeal took on added value because, as viewed by a prudent investor, it was a prime candidate for conversion.
It is important to note that the arguments made in Highview and Center-Whiteman did not involve a change in use but rather changes in the nature of the type of occupancy and form of ownership which, if proved, may have resulted in different values. Such is not the case here where, as of the three critical assessing dates, the land’s use was restricted to residential purposes.
Where the highest and best use is determined to be a use (or degree of use) not permitted by the zoning ordinance as *329 of the assessing date, except in the most unusual cases, it is unlikely that an increment of value in anticipation of a zone change or variance from the zoning ordinance requirements may be added to reflect the probability of such action. Here, if and when a rezoning or variance from the zoning ordinance use requirements is obtained thereby permitting office building construction in which event a higher value would obtain (a fact of the market place agreed to by both experts) there is nothing in the record to suggest that that theory would ever become fact. As such, as to this property, although perhaps prophetic, taxpayer’s opinion is based on pure speculation, a fact which the witness obviously recognized in valuing the plot for the legal use for which it was zoned, i.e., highrise residential.
The two experts relied on a total of seven sales of vacant tracts, including the sale of the subject, all of which were zoned for highrise-development use. The sales occurred between September 1979, one year prior to the first assessing date, and September 1983, one year after the last assessing date. The size of these parcels ranged between .57 and 5.539 (the subject) acres and the prices between $381,964 and $1,384,545 an acre. Following their analyses of the sales, taxpayer’s expert allocated a value to the subject based on the number of apartment units permitted by the zoning ordinance, while borough’s witness based his opinion on the total square footage (241,279 square feet) of the subject.
I reject the use of a square foot analysis in these circumstances for the same reasons that were stated in Berkeley Arms Apartment Corporation v. Hackensack City, 6 N.J.Tax 260 (Tax Ct.1983) where it was said:
Even more difficult to accept was his use of a square-foot analysis rather than a unit cost. The evidence clearly and convincingly disclosed that investors in these types of properties are not interested in the square footage of a given parcel for it is the number of units that produces rental or sales income depending on how the property is utilized. Generally speaking, the size of a lot bears no necessary relationship to the number of units that can be placed on a property which is controlled by the applicable zoning, bulk and height requirements. See Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982), aff’d 6 N.J.Tax 349 (App.Div.1984), certif. denied 97 N.J. 581, 483 A.2d 125 (1984). Common *330 sense and logic dictate the rejection of a square foot basis and the adoption of a unit basis. [At 271-272]
Turning first to the sale of the subject I note that on September 30, 1983 taxpayer conveyed the property to the Borough of Fort Lee for a consideration of $722,152 an acre. While this sale was consummated well beyond the assessment dates the total $4,000,000 purchase price, according to borough’s witness, was based on an appraisal report which he prepared, in the preparation of which he considered an unconsummated contract of sale dated April 1982, six months before the last assessment date, between taxpayer and an unrelated third party. The borough purchased the property with Green Acre funds. A detailed analysis of both the contract and the sale are required for although the selling price of real property is only a “guiding indicium” of fair value and ordinarily is merely evidential, such price under certain circumstances might become controlling. Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 162, 65 A.2d 828 (1949). The statutory criterion is, of course, the price for which the subject premises would have been sold on October 1 of each pre-tax year at a fair and bona fide sale by private contract. N.J.S.A. 54:4-23. Applying that statutory mandate to the circumstances surrounding the sale, I conclude for the reasons following that no weight can be attributed to the sale price.
Prior to September 4, 1980 the R-10 zone permitted the construction of a 21-story residential structure containing 86 units an acre on this site. On that date, however, the ordinance was amended, the effect of which was to reduce the maximum height to 15 stories and the density to 50 units an acre. Taxpayer instituted suit in October 1980 attacking the validity of the amendment to the ordinance. For reasons not important here the matter was periodically placed on the inactive list. It was finally settled with the withdrawal of the complaint upon acquisition of the property by the borough in September 1983. Under these circumstances it cannot be said with any degree of certainty that the $4,000,000 sale price was negotiated at arm’s length.
*331 Taxpayer’s appraiser, based on considerable experience in dealing with government acquisition of properties through the use of Green Acre funds, testified that a premium is often paid to avoid the expense of litigation. Although the appraiser did not participate in the subject sale and thus with respect to it his observation may only be characterized as an assumption, it obviously deserves consideration in view of the court action instituted by taxpayer which was only settled with the withdrawal of the complaint when the sale took place. That observation takes on added significance in view of the fact that such sales are deemed unuseable by the Director of the Division of Taxation in computing the school aid ratio. N.J.S.A. 54:1-35.1 etseq.; N.J.A.C. 18:12-l.l(a)15.
Borough’s expert’s reliance on the unconsummated April 1982 contract between taxpayer and a third party is misplaced. Even a cursory review clearly indicates that the instrument was more in the nature of an offer than a contract. For example, no cash was paid by the proposed purchaser whose deposit was in the form of a letter of credit.[1] More importantly, in addition to other contingencies in the contract, is the following provision which would permit the buyer to terminate the contract if:
... Buyer shall not have received, within sixty (60) days of the date of this agreement, a mortgage loan commitment from such lender, in such amount, at such interest rate and in all ’respects on such terms and conditions and for such purposes as buyer deems appropriate, it being agreed that buyer shall have full discretion in determining whether an appropriate mortgage loan commitment has been issued.
The weight, if any, to be attributed to such contracts depends on many factors not the least important of which is its contingent or noncontingent nature. If an agreement is so replete with contingencies which thereby seriously detract from the likelihood that it will be consummated, the less supportable is an opinion that it reflects a freely bargained price between a *332 willing buyer and a willing seller. Such contracts are not really contracts at all but are better characterized as offers or options to purchase which deserve little or no weight in the valuation process. In that connection the Supreme Court in N.J. Turnpike Authority v. Bowley, 27 N.J. 549, 143 A.2d 558 (1958) stated:
Offers, especially oral ones, may be glibly made without serious intention or the required resources. The offeror may entertain contingencies and terms reserved for later serious discussion. The offeror is likely to be unavailable for examination as to his intentions, ability to perform, or unusual motivations for seeking the property. The area for collateral inquiry is far broader than in the case of actual sales, as is also the opportunity for collusion and fraud. For such reasons, the great weight of authority declines to accentuate the element of speculation which inevitably attends an inquiry into value. [At 556,143 A.2d 558]
See also In Re Port of New York Authority, 28 N.J.Super. 575, 583, 101 A.2d 365 (App.Div.1953); Red Devil, Inc. v. Union Township, 5 N.J.Tax 1, 5 (Tax Ct.1982); Olin Mathieson Chemical Corp. v. Borough of Paulsboro, 3 N.J.Tax 255, 261-63 (Tax Ct.1981); cf. Highview Estates v. Englewood Cliff's, supra (offer of a mortgage loan given no weight in the determination of a capitalization rate).
The facts here are strikingly similar to those in Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982), aff’d 6 N.J.Tax 349 (App.Div.1984), certif. den. 97 N.J. 581, 483 A.2d 125 (1984) which involved the valuation of vacant land and where one of the issues concerned the weight to be given an unconsunimated contract for the sale of the subject property which was executed a few days after the assessment date. Although holding that the agreement could not be excluded from consideration solely because it was executed after the assessment date, Judge Lario observed that the weight to be attributed to the agreement depended on all of the surrounding facts and circumstances. The contract contained numerous contingencies which afforded the buyers ample opportunity to avoid the agreement. For example, the buyer’s obligation to purchase was conditioned on receiving final approvals for subdivision, site and building plans, installation of sewer facilities, adequate utilities and any and all other necessary governmental applications. *333 Additionally the contract provided for very unusual financing. Judge Lario held:
By reason of the substantial number of contingencies, the seven-year, interest-free, purchase money mortgage and the fact that the closing was not scheduled within a reasonable time after its execution, this court views the contract mainly as an option agreement and I conclude that its purchase price has no probative value. [At 68]
In relying on unconsummated contracts of sale in the valuation of real property two very basic and established principles must be emphasized. First, no such contract may be taken on its face without a thorough review of its provisions and the circumstances surrounding its execution. Second, when such inquiry reveals that it is replete with contingencies and is in fact nothing more than an offer or option to purchase, the contract must be disregarded and given no probative effect. This is exactly the situation present in the subject matter.
Both experts also referred to an extremely comparable 2.3-acre tract located directly across the street from the subject in the same R-10 zone which was purchased in September 1979 for $382,296 an acre, was resold in February 1982 for $803,649 an acre, and sold again in July 1983 for $2,065,217 an acre. Admittedly a variance for office use had been obtained well in advance of the July 1983 transaction, which negates its usefulness in attempting to establish a value for the subject. While heavily relying on the September 1979 sale taxpayer’s appraiser paid no heed to the subsequent transactions. Borough’s expert relied, in varying degrees, on all three sales and in doing so either ignored or was unaware of some very important circumstances surrounding these transactions.
According to borough’s appraiser the September 1979 transaction, at which time the zoning ordinance permitted 86 units an acre, was based on the construction of 180 residential units which equates to a unit value of $4,885. On the basis of 86 units an acre and the application of a $4,885-unit price to the 476 units permitted on the subject land (5.539 acres X 86 units an acre) the resulting land value is $2,325,260. Adjusting for the time of the sale, which adjustment took into consideration *334 the resales of this parcel which indicated tremendously escalating values, the 1979 value supported his opinion of value for the three years under review. Overlooked in his analysis however is the fact that the maximum number of units permitted by the R-10 provision of the zoning ordinance were reduced from 86 to 50 an acre in September 1980, one year after the first sale but before all three assessment dates. By applying the $4,885 a unit price to only 276 units, the maximum number permitted on the subject site, (5,539 acres X 50 units an acre) a land value of $1,348,260 results which is by far, more supportive of taxpayer’s witness’ conclusion.
The first resale of the property for $1,850,000 in February 1982 which, according to borough’s witness, was still based on a 180 unit building notwithstanding that the then amended ordinance permitted only 115 units (2.302 acres X 50 units an acre) translates to $10,278 a unit. If the expert had used as a base the maximum number of units then permitted on the subject site the unit value is increased to $16,073.
As was the case in his analysis of the September 1979 acquisition in which he erred in computing the allowable number of units an acre, borough’s expert also erred in heavily relying on the February 1982 resale. It appears that he simply assumed that it was the purchaser’s intention to pursue the construction of a highrise-apartment structure. A careful analysis of the underlying facts would have demonstrated that such was not the case.
In September 1981 an application was filed with the borough board of adjustment seeking a variance from the R-10 residential use requirements in order to construct a highrise-office building on the site. The applicant, as was acknowledged by borough’s expert, was a well known office-building developer and the same party who purchased the property some five months later. Public hearings were conducted concerning the application on October 5, 1981, October 19, 1981, November 16, 1981 and December 12, 1981. At the last meeting the board voted to approve the application and its attorney was directed *335 to prepare the appropriate resolution. Thus, at that point, only the mere formality of adopting the resolution remained to be accomplished. Title closed in February 1982.[2]
Unlike the circumstances surrounding the unconsummated April 1982 contract of sale of the subject site which indicated that its consummation was highly unlikely, the circumstances concerning the variance application clearly suggest the existence of a reasonable probability that the request would be granted and the site would be devoted to office use.
In State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958), a condemnation case, the specific question involved was whether the market value of the property therein condemned, as of the date of taking, may be affected by the prospect of an amendment of the zoning ordinance. Chief Justice Weintraub stated:
It is generally agreed that if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown. [Citations omitted]
In short if the parties to a voluntary transaction would as of the date of taking give recognition to the probability of a zoning amendment in agreeing upon the value, the law will recognize the truth. [At 116-117, 138 A2d 833]
The respective experts readily agreed that the market conclusively indicated that vacant land for office-building use had a far greater value than land for highrise-apartment use. There being a reasonable probability, at the very least, that the purchaser in February 1982 would be permitted to utilize the tract for office purposes I find that the purchase price was influenced by that fact and accordingly attribute no weight to the February 1982 sale. To consider the sale price as being indicative of value for apartment lands would be to find that in February 1982 an apartment developer would be prepared to expend over $16,000 a unit for the land ($803,649 an acre sales *336 price -i- 50 units an acre) when in September 1979 the land was purchased for $382,296 an acre or $4,445 a unit ($382,296 -h 86 units an acre). Even given the annual rise in property values, to accept such an increase over a two and one-half-year period is unwarranted. The difference in the two purchase prices is logically and more realistically accounted for in the different uses to which the two buyers intended to devote the land.[3]
Remaining for analysis are four sales of highrise-residentially zoned tracts including the September 1979 sale primarily relied on by taxpayer, discussed supra. Two of the sales properties were only approximately ten % of the size of the subject. Being located in the R-10 zone they could only accommodate between 28 and 31 units as opposed to the 276 units which could be constructed on the subject tract. This vast difference in the size of those tracts may somewhat diminish the weight to be attributed to them but it does not disqualify them from consideration. The other sale property, containing 3.85 acres, was zoned R-8A which allows 95 units an acre. Its slightly smaller area is counterbalanced by the fact that it could accommodate 89 more units than could the subject. This property, known as the Buckingham Towers site, was sold on July 31, 1981 approximately at the mid-point of the time period in question (October 1, 1980-October 1, 1982) for $1,384,-545 an acre or $14,574 a unit.
The Buckingham sale confirms what was even acknowledged by taxpayer’s appraiser, that the $4,885 a unit price reflected in the September 1979 sale was at the lower end of the value spectrum. In that regard it must be noted that one year later, as of the first assessment date, taxpayer estimated the unit value of the subject at $8,823. Conversely, borough’s witness admitted that the Buckingham property was superior to the subject. That tract is located on the Palisades on the site of the *337 former Palisades Amusement Park, had an unobstructed view of the New York skyline, and is in close proximity to the George Washington Bridge and the Lincoln Tunnel. It had been owned by Centex Homes of New Jersey and was part of a larger parcel covering the municipalities of Edgewater and Cliffside Park on which was constructed the two highrise-tower buildings known as Winston Towers. Also constructed on the balance of the tract was the luxury Kensington Park townhouse complex. Additionally, all approvals had already been secured to construct 365 units in two 20-story buildings.[4]
I find the Buckingham sale property to be most comparable to the subject. However, it is clear that an adjustment must be made to account for its superior location. Unfortunately borough’s expert, while conceding its superior location, rendered no opinion concerning the degree of adjustment required for that difference; he simply considered this sale together with the other sales on which he relied (which were rejected by the court) to arrive at an overall adjustment. Notwithstanding the lack of such specific information, however, it is clear that the advantages enjoyed by this tract require an adjustment of at least 15% vis-á-vis the subject. Noting that the sale date of July 31, 1981 was but two months prior to the assessing date for the 1982 tax year, a 15% adjustment to that price, ($14,500 a unit) results in a value of $12,325 a unit, or $3,401,700 for the subject in 1982.
The prices paid for the two smaller tracts support that value. Although it is generally accepted that the market place supports a higher unit value for smaller acreage, here, where the maximum density and height requirements play such a critical role, I find the reverse to be true. As noted earlier, the subject site could accommodate 276 units in a 15-story highrise structure; two 20-story buildings containing 365 units were approved for the Buckingham site. Clearly the structures which *338 could be erected on the two smaller tracts and which could contain only 28 and 31 units would be in the low-lowrise category, probably no more than three or four stories high. As such, the tenants would not enjoy the amenities of the highrise residents, including the unobstructed views from the upper floors, which factors would result in comparatively lower rents and values.
The .57 acre-tract was sold in October 1981 for $325,-000, or $11,600 a unit. The .63 acre-tract was sold in February 1983 for $420,000 or $13,550 a unit. After adjusting for time and size, both sales reasonably support a value of $12,325 a unit for the subject as of October 1981.
The sales of the two smaller tracts also play an important role in arriving at a time adjustment factor. These properties are extremely comparable to each other in terms of location, size, zoning and the number of units permitted. The first tract was sold for $11,600 a unit while the second was sold for $13,550 a unit one and one-half years later. The increase in price is thus found to be approximately 12% a year which increase fully supports taxpayer’s estimate of 15% which I find reasonably reflects the annual rise in vacant land values. By applying the 15% adjustment to the 1982 value of $3,401,700 I find the value of the subject to be $2,891,445 in 1981 and $3,911,955 in 1983.
The ratios of assessment ($3,860,500) to true value are 134%, 113% and 99% respectively for the three years under review. As such, pursuant to Chapter 123, the taxpayer is entitled to relief from discrimination in all years as the upper limits of the Chapter 123 corridor, 110% in 1981, 105% in 1982, and 95% in 1983 are exceeded in each case. That relief is afforded by applying the Chapter 123 ratios of 95%, 91%, and 82% to the true values which results in rounded assessments of $2,746,900 for 1981, $3,095,500 for 1982 and $3,207,800 for 1983. Accordingly the Clerk of the Tax Court is directed to enter judgments as follows:
*339 1981 1982 1983
Land $2,746,900 $3,095,500 $3,207,800
Improvement -0--0--0-
Total $2,746,900 $3,095,500 $3,207,800

 The instrument required an initial deposit of $50,000 and an additional deposit of $100,000, also by letter of credit, 63 days after execution; the total being only 3.75% of the $4,000,000 purchase price.

 The formal resolution was not adopted until April 1982. The delay in that action, at least in part, appears to have been caused by the failure of the applicant to appear at a meeting when the formal vote on the resolution was scheduled. The resolution passed by a vote of six to one.

 As noted above the property was sold one and one-half years later for $2,065,217 an acre. Construction of an office building on the site was commenced in 1984.

 The purchaser paid $600,000 for plans, specifications, permits, etc., in addition to $5,330,500 for the land.