BIANCO, J.T.C.
This formal opinion revises, amends and supplements the court’s determination set forth in a letter opinion of December 22, 2011, concerning the challenge by plaintiff, Gale & Kitson Fredon Golf, LLC (“Gale & Kitson”), to the 2008 and 2009 property tax assessments of its property known as Bear Brook Golf Club (“Bear Brook”), located within the defendant municipality, Township of Fredon (“Fredon”) [1]. For the reasons set forth herein, the court affirms Bear Brook’s 2008 and 2009 assessments.
Bear Brook is a 183.01-acre, 18-hole semi-private golf course. It is zoned AR-6 (agricultural/residential) and is deed restricted for open space or recreational use; it cannot be further subdivided. Bear Brook contains a clubhouse, maintenance shed, maintenance building, storage garage, and pump house.[2] For tax years 2008 and 2009[3], Bear Brook was assessed at:
*274 Land $5,490,300
Improvements $1,835,600
TOTAL $7,325,900[4]
According to Gale & Kitson, Bear Brook’s true value on the relevant valuation dates was:_

AMOUNT_TAX YEAR VALUATION DATE

$2,200,000_2008_October 1, 2007_
$2,050,000_2009_October 1, 2008_
In contrast, Fredon contends that the time value of Bear Brook on the relevant valuation dates was:

AMOUNT_TAX YEAR VALUATION DATE

$8,526,000_2008_October 1,2007_
$9,178,000 2009 _October 1, 2008_
In valuing Bear Brook, both parties stipulated that Bear Brook’s Highest and Best was as a golf course, and agreed that utilizing the Sales Comparison Approach to value Bear Brook would be inappropriate.
Gale & Kitson utilized the Income Approach to valuation, in which it calculated Bear Brook’s fair market rent through: (i) utilizing “pro forma revenue”[5]; (ii) multiply the (pro forma) gross revenue from golf fees, pro shop sales, food/beverages sales, and miscellaneous income by set percentages; and then (iii) add these *275 amounts together (less administrative costs)[6] . Gale & Kitson derived these set percentages by reviewing the ratio of “overall rent” to “gross revenue” for nine leased golf courses, which it contends are comparable to Bear Brook (four in Massachusetts, three in New York, one in Connecticut, and one in New Jersey). Finally, by applying determined capitalization rates of 10.0% for 2008 and 11.00% for 2009, Gale & Kitson concluded that Bear Brook’s true value for 2008 was $2,200,000 and $2,050,000 for 2009.
Fredon contends that Gale & Kitson’s Income Approach is improper since Bear Brook is a special purpose property, which is more appropriately valued by using the Cost Approach. Fredon also argues that Gale & Kitson’s proposed comparables are not comparable and that Gale & Kitson’s Income Approach is a valuation of Bear Brook’s going concern, not its real property value.
At trial, Gale & Kitson called two witnesses: Glenn Geiger (“Mr. Geiger”),[7] General Counsel for Kitson Evergreen, LLC[8]; and Jeffrey R. Dugas, MAI (“Mr. Dugas”)[9], Appraiser and Princi *276 pal at Wellspeak, Dugas & Kane, L.L.C. Fredon called Theodore J. Lamicella, Jr., SCGREA, CTA (“Mr. Lamicella”)[10], Director of Appraisal & Litigation Services at Appraisal Systems, Inc.
Gale & Kitson purchased Bear Brook in 2001 with the goal of building a clubhouse, improving the golf course, and eventually selling.* [11] Gale & Kitson designed the clubhouse and received final approval in 2007. While Gale & Kitson believed the clubhouse would be the key to Bear Brook’s success, Bear Brook has lost money every year since the clubhouse opened.[12]
In 2008 Gale & Kitson attempted to sell Bear Brook to BNY Development & Consulting Co., Inc. (“BNY”). Gale & Kitson and BNY negotiated the terms of the sale, exchanged drafts, and finally agreed to a sale price of $2,100,000 with the understanding that the contract would be signed within two days and proceed to closing. However, in December 2008, the sale fell through because BNY’s financer backed out.
*277 Over Fredon’s objection, the court allowed Mr. Dugas to explain the calculation of Bear Brook’s pro forma gross revenue and operating expenses. He was further allowed to address comparable leases used to calculate the ratio of “overall rent” to “gross revenue” and the 2008 and 2009 capitalization rates.[13]
Mr. Dugas conceded that although he calculated the pro forma capitalization rates (on which Gale & Kitson based its final capitalization rates) using the Band of Investment method that he could not provide the studies or documents supporting his mortgage component. In fact, when asked about the “Fixed Interest Rate [of] 6.0%” and whether it changed between October 2007 and October 2008, Mr. Dugas did not know. Mr. Dugas also admitted that in determining the equity component of the Band of Investment, he relied on Korpacz surveys from 2004 and 2005, even though the relevant valuation dates were October 1, 2007 (tax year 2008) and October 1, 2008 (tax year 2009) and cited a 2010 Society of Golf Appraisers survey of capitalization rates.
Furthermore, Gale & Kitson’s appraisal report contained a graph, based on information published by RealtyRates, entitled “overall capitalization rates for golf and country club properties”; Mr. Dugas admitted, however, that the graph only provided the capitalization rates for the 4th Quarter of 2006, the 4th Quarter of 2008, and the 2nd Quarter of 2010 and did not demonstrate quarterly changes in capitalization rates. Rather, the graph simply showed general trends. In fact, Mr. Dugas admitted that he did not know, and could not testify to, the capitalization rate between the 3rd Quarter and 4th Quarter of 2007 (i.e. on October 01, 2007) by referencing the graph.
In support of Fredon’s conclusion of value, Mr. Lamicella concluded that Bear Brook is a limited-market and special purpose property since golf courses typically do not sell or lease. Accordingly Mr. Lamicella’s opinion is that the only reliable *278 valuation method is the Cost Approach. In conducting the Cost Approach, Mr. Lamicella first looked for comparable land sales to appraise the underlying real estate and then calculated the cost of replicating the current improvements.
Four “comparable” land sales were offered: (i) 20.867 acres, conservation deed restriction, November 10, 2006 date of sale; (ii) 20.68 acres, open space deed restriction, October 30, 2005 date of sale; (iii) 54.087 acres, reereation/eonservation deed restriction, September 4, 2009 date of sale; and (iv) 74.55 acres, conservation deed restricted, April 22, 2008 date of sale. Mr. Lamicella made no adjustments for size, functionality, or time; however, he made 30% adjustments for inferior “development approvals”. Mr. Lam-icella concluded that the value of Bear Brook’s real estate was $2,745,000 for 2008 and 2009 (i.e. $15,000/acre).
Next, Mr. Lamicella relied on the Marshall & Swift Cost Estimators[14] and concluded the replacement cost for Bear Brook’s improvements for 2008 would be $5,129,710[15] and $6,433,277 for 2009[16]. Mr. Lamicella concluded that Bear Brook’s true value for 2008 was $8,526,000 and $9,178,000 for 2009.

ANALYSIS

a. Burden of Proof
It is a “settled rule [ ] that there is a presumption that an assessment ... is correct and the burden of proof is on the taxpayer to show otherwise.” Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); See L. Bamberger & Co. v. Div. of Tax Appeals, 1 N.J. 151, 159, 62 A.2d 389 (1948). *279 However, “it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment. Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.” Aetna Life Ins. Co., supra, 10 N.J. at 105, 89 A.2d 385 (1952).
Moreover, “[i]n a non-revaluation year ... the Tax Court may increase the assessment even in the absence of a counterclaim ... if the proofs justify same.” Campbell Soup Co. v. City of Camden, 16 N.J.Tax 219, 226 (Tax 1996) (citing Passaic St. Realty Assoc., Inc. v. City of Garfield, 13 N.J.Tax 482, 484 (Tax 1994)). However, “[i]n a revaluation year, absent a counterclaim by the taxing district, the Tax Court may not increase the assessment above the original assessment ... without substantial evidence ... [demonstrating] the assessment ... is so far removed from true value and that the assessment methodology is arbitrary or capricious.” Campbell Soup Co., supra, 16 N.J.Tax at 226 (emphasis added); See F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 431, 495 A.2d 1313 (1985); See also Short Hills Assoc./Taubman Co. v. Township of Millburn, 20 N.J.Tax 352, 357-58 (Tax 2002).
b. Valuation Methods
“New Jersey courts have held, consistent with established appraisal principles, that property can be valued according to three valuation methods: comparable sales, capitalization of income[,] and depreciated reproduction cost.” 43 New Jersey Practice, State and Local Taxation, 7.3, at 101 (David E. Crabtree) (1st ed. 2007); See Pantasote Co. v. City of Passaic, 100 N.J. 408, 411, 495 A.2d 1308 (1985); Glen Wall Assoc. v. Township of Wall, 99 N.J. 265, 279, 491 A.2d 1247 (1985).
However, in evaluating the valuation methodologies presented here, the court is not bound by the opinions of expert witnesses. See Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). “[A]n expert’s opinion is only as good as the data upon which the expert relied.” Greenblatt v. City of *280 Englewood, 26 N.J.Tax 41, 54-55 (Tax 2011). See also Dworman v. Tinton Falls, 1 N.J.Tax 445, 458 (Tax 1980) (An expert’s opinion “depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard.”). An expert’s opinion may be adopted in whole or in part or completely rejected. See Atlantic City v. Atlantic City Bd. of Tax, 2 N.J.Tax 30, 42-43 (Tax 1980). Although the court is required to apply its expertise in valuation matters, see Glen Wall Assocs. v. Wall Township, 99 N.J. 265, 491 A.2d 1247 (1985), it must be in conjunction with the data submitted by the parties. See Greenblatt, supra, 26 N.J.Tax at 56, emphasis added (finding that the court can “deduee[ ]” the value of the property at issue “only ... when there is sufficient substantial and competent evidence in the record to support that determination”). See also Global Terminal & Container Service v. Jersey City, 15 N.J.Tax 698, 703 (App.Div.1996) (this court’s duty to “make an independent determination of value ... is not boundless, [and, therefore] [t]he court need not make such determination in the absence of sufficient compliant evidence”) (citations and internal quotations omitted).

i. Income Capitalization Approach a/kla Income Approach

Pursuant to the Income Approach, “gross income is first estimated then a reduction for vacancy and loss allowance is taken, to arrive at effective gross income, which is reduced for expenses. This exercise produces net operating income, which is then capitalized at a given rate to arrive at true value.” 43 New Jersey Practice, State and Local Taxation, supra, at 107; See also New Jersey Real Property Appraisal Manual for New Jersey Assessors, Vol. I, at I-119 to -120 (3rd ed.)
A “capitalization rate” is defined as “[a]ny rate used to convert income into value.” The Dictionary of Real Estate Appraisal, Appraisal Institute, at 48 (3rd ed. 1998); See also The New Jersey Real Property Appraisal Manual, supra, Vol. I, at 1-119. Capitalization rates are “extracted from market data.” The Appraisal of Real Estate, Appraisal Institute, at 158 (10th ed. 1992). The *281 “[c]apitalization rate selection is often one of the most difficult aspects of valuing a golf facility ... Therefore, a thorough study ... is a must.” Appraisal Journal, Vol. LIX, Number 1 at 44-45 (January 1991) (emphasis added). “Accepted techniques” for determining capitalization rates include using a “band of investment [with] mortgage and equity components....” The Appraisal of Real Estate, supra, at 467.
“[W]hat is required is that reliable market data be furnished to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.” Glen Wall Assoc., supra, 99 N.J. at 279-80, 491 A.2d 1247. The “probative value of an expert’s opinion depends entirely upon the facts and reasoning adduced in support of it.” Kearny Leasing Corp. v. Town of Kearny, 6 N.J.Tax 363, 376 (Tax 1984), aff'd, 7 N.J.Tax 665 (App.Div.), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985).[17] Stated otherwise, an “expert’s conclusion rises no higher than the data which provide the foundation.” Town of West Orange v. Goldman, 2 N.J.Tax 582, 588 (Tax 1981); See 43 New Jersey Practice, State and Local Taxation, supra, at 111 (“the determination of the appropriate [capitalization] rate depends upon the credible evidence and the persuasive powers of the experts”).
Here, Mr. Dugas utilized the Band of Investment method in calculating his capitalization rates, but relied on capitalization rate surveys from 2004 and 2005 (and referenced a 2010 survey), even though the relevant valuation dates were October 1, 2007 and October 1, 2008. Likewise, the “overall capitalization rate” graph provided by Mr. Dugas did not indicate capitalization rates for October 1, 2007 or October 1, 2008. While the graph indicated a capitalization rate for the 4th Quarter of 2008, the eourt is unable to discern whether this accurately reflects capitalization rates on October 1, 2008. Lastly, Mr. Dugas failed to provide the court *282 with documentation to support any of its capitalization rate figures or calculations.[18]
Furthermore, golf courses “are usually considered as special purpose properties; they are not so regularly sold or exchanged in the marketplace as most other properties.” Karla L. Heuer, Golf Courses, a Guide to Analysis and Valuation 28 (1980).[19] The court is satisfied that semi-private golf courses like “private nonprofit and municipal courses ... usually do not generate sufficient income for return on investment, [and, therefore, the] application of the income approach [to value] is often precluded.” Id. at 102. “[T]he income approach is seldom appropriate in appraising a private nonprofit club or a municipal course” Id. at 107; this court finds no distinction with semi-private courses such as Bear Brook.[20]
Accordingly, for all of the reasons stated above, the court rejects Gale & Kitson’s Income Approach.

*283
ii. Depreciated, Reproduction Cost a/k/a Cost Approach

The Cost Approach “involves a replication, through the use of widely accepted cost services ... of the cost of the components of the building to be valued, less ... depreciation[s]----” 43 New Jersey Practice, State and Local Taxation, supra, at 113; See Livingston Mall Corp. v. Township of Livingston, 15 N.J.Tax 505, 510 (Tax 1996) (referring to “Marshall Valuation Service” a/k/a Marshall & Swift). However, the “[r]aw land valuation is accomplished by a sales comparison____” The Appraisal Journal, supra, at 45.
“Evidence of comparable sales is effective in determining [the] value of property for property tax purposes only where there is substantial similarity between the properties” and the subject. Kearny Leasing Corp., supra, 6 N.J.Tax at 376. However, “[ejomparability is [ ] vitiated when there is a vast difference in size between the comparables and the subject.” 43 New Jersey Practice, State and Local Taxation, supra, at 103; See Thomas J. Lipton, Inc. v. Township of Raritan, 10 N.J.Tax 202, 208 (Tax 1988), aff'd, 11 N.J.Tax 100 (App.Div.1989) (finding sales comparison inappropriate when “comparables” were two and three times larger than the subject).
In fact, in Dresser Industries, Inc. v. Town of Harrison, 12 N.J.Tax 159, 166 (Tax 1991), the Tax Court rejected proffered sales as “not comparable by reason of size.” The court found the “usable square footage” of the subject property “to be 870,223”, whereas “the useable square footage in three of the expert’s comparables [were] only 140,000 and ... 124,600 square feet____” Id. at 166, 168; See also Borough of Alpine v. Alpine Hills, Inc., 1 N.J.Tax 136, 141 (Tax 1980), aff'd, 179 N.J.Super. 65, 2 N.J.Tax 391, 430 A.2d 641 (App.Div.1981).
Moreover, “ ‘[a]ny difference in the ... highest and best use of a potential comparable sale and the subject property must be addressed. The appraiser must recognize the difference and determine if the sale is an appropriate comparable____’” Pepperidge Tree Realty Corp. v. Borough of Kinnelon, 21 N.J.Tax 57, 64 (Tax 2003) (emphasis added) (quoting Appraisal Institute, *284 The Appraisal of Real Estate, at 436-37 (12th ed. 2001)). In fact, a “judge may reject a property as a comparable solely because it has a different highest and best use.” City of Atlantic City v. Boardwalk Regency Corp., 19 N.J.Tax 164, 189 (App.Div.2000); See American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542, 557 (Tax 1998), aff'd, 19 N.J.Tax 46 (App.Div.2000); Newport Center v. City of Jersey City, 17 N.J.Tax 405, 418 (Tax 1998).[21]
Here, three of the four “comparables” that Mr. Lamicella proffered were deed restricted as open space preservation or for conservation. Gale & Kitson, cannot sell Bear Brook as open space without an “abandonment of the” golf course, which both parties have agreed is its highest and best use.
In fact, only comparable number three allowed for recreation; however, the date of sale was September 4, 2009, almost a year after the 2009 valuation date and almost two years after the 2008 valuation date. While “post-assessment date sales [can] be used to corroborate an opinion of value based on pre-assessment date information”, Mr. Lamicella failed to provide any reliable pre-assessment data. Atlantic City, supra, 19 N.J.Tax at 184.
Furthermore the court observes that Mr. Lamicella’s proposed comparables are significantly smaller in size than Bear Brook (ranging from 11.29% to 40.73% the total size of Bear Brook)[22] and required 30% adjustments for inferior development approvals [23]. Moreover, the court is not convinced that the sale prices of *285 Mr. Lamicella’s proposed comparables are market prices. While, Mr. Lamicella raised concerns regarding whether Bear Brook’s lease comparables were market leases since numerous lessors were not-for-profit entities, such as municipalities,[24] he did not address whether the sales prices of his own comparable sales numbers one, three, and four were affected by the fact that the purchaser was the State of New Jersey, Department of Environmental Protection, a non-for-profit entity.
While it is clear to the court that the Cost Approach is the most appropriate valuation method for Bear Brook, Fredon’s Cost Approach must nevertheless be rejected for the deficiencies delineated hereinabove. This rejection is warranted irrespective of the fact that Fredon’s conclusion of value, if accepted by the court, would have resulted in a significant reduction in Bear Brook’s assessment for at least tax year 2008[25], albeit not to the extent sought by Gale & Kitson. When challenging an assessment a municipality is equally bound by the presumption of correctness of the assessment as any taxpayer. See Township of Warren v. Suffness, 225 N.J.Super. 399, 542 A.2d 931 (App.Div.), certif. denied, 113 N.J. 640, 552 A.2d 166 (1988). This is no less true when, as here, in defending a challenge to an assessment, the municipality’s value conclusion supports a reduction of the assessment (although to a lesser degree than the taxpayer’s concluded value).
Furthermore, when value is at issue, there can be no per se admission that the assessment is incorrect simply because the municipality’s conclusion of value would result in a lower assessment. The Assessor (whose assessment is presumed cor- *286 reet) is not a party to a tax appeal proceeding; the municipality and the Assessor are not one in the same. See Mobil Oil Corp. v. Township of Greenwich, 20 N.J.Tax 66, 80 (Tax 2002). “Municipal tax assessors serve both local and state governmental needs ... [and are] ... subject to the control of both the municipality and the State.” Casamasino v. City of Jersey City, 158 N.J. 333, 344, 730 A.2d 287 (1999), citing Mitchell v. City of Somers Point, 281 N.J.Super. 492, 499, 658 A.2d 1276 (App.Div.1994); Jeffers v. City of Jersey City, 8 N.J.Tax 313, 316-17 (Law Div.1986), aff'd, 214 N.J.Super. 584, 520 A.2d 797 (App.Div.1987); Horner v. Ocean Township Comm., 175 N.J.Super. 533, 537, 420 A.2d 1033 (App. Div.1980). “[The] ‘hybrid’ nature of the position of municipal tax assessor is evident from the fact that the duties of the office, the method of assessment, and the manner of assessment and recordation are governed by statute, the Director of the Division of Taxation, and the County Board of Taxation.” Mobil Oil Corp., supra, 20 N.J.Tax at 80 (citing N.J.S.A. 54:1-6 to -30).
Moreover, a
[tax assessor] is an agent of the Legislature, and his discretionary judgment is reviewable only through the administrative and judicial processes provided by law. Although his jurisdiction is local, his powers and duties are prescribed by the Legislature, and it is of paramount importance that the integrity of his office be in no way diluted by local interference.
[Id. at 81 (citation omitted, emphasis included).]
There is, however, no such agency relationship between a municipal assessor and a municipality or its appraisal expert. Accordingly, the value conclusion of Mr. Lamicella on behalf of Fredon, which supports a reduction of the assessment at issue, cannot be deemed to be a party admission since the setting of that assessment was not within the control of Fredon, and the Assessor who set the disputed assessment did not act on behalf of Fredon. See Restatement (Second of Agency Section 1 emt. a (1958)), wherein an agency relationship “is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act.”; See also N.J.R.E. 803(b)(4) (cmt.4), (“[T]he statement of the agent ... would not be admissible ... because the declarant was *287 not an agent of the party against whom the evidence is offered.”) Here, the Assessor does not act for Fredon and vice versa.
Furthermore, Mr. Lamieella’s conclusion of value of Bear Brook and that of the Assessor are clearly different and would result in different tax assessments. The court is not bound by a municipality’s conclusion of value simply because it would result in a lower assessment. Rather, a municipality’s conclusion of value that supports a reduction of the assessment is merely a contention which must be supported by the evidence; here, it was not.
In view of this court’s rejection of their conclusions of value, neither Gale & Kitson nor Fredon has met their respective burdens for any adjustment to be made to the assessment placed on Bear Brook for either of the tax years in dispute.
c. The Unconsummated Contract
In “the absence of a completed sale, evidence of the price agreed upon in a binding contract of sale for property between the owner and a purchaser, both acting in good faith, would be of substantial significance in arriving at the fair market value of such property.’ ” Little Egg Harbor, supra, 316 N.J.Super. at 281, 720 A.2d 369 (quoting City of East Orange v. Crawford, 78 N.J.Super. 239, 244, 188 A.2d 219 (Law Div.1963)). “The fact that a contract is unconsummated does not ipso facto render the contract inadmissible to establish a property’s fair market value.” Little Egg Harbor, supra, 316 N.J.Super. at 281, 720 A.2d 369. However, the “weight, if any, to be attributed to such [unconsummated] contract depends on many factor not the least important of which is its contingent or noncontingent nature.” Linwood Properties, Inc. v. Borough of Fort Lee, 7 N.J.Tax 320, 331 (Tax 1985) (emphasis added).
“If an agreement is so replete with contingencies ... [s]uch contracts are not really contracts at all but are better characterized as offers or options to purchase which deserve little or no weight in the valuation process.” Id. at 331-32. However, if “a litigant establishes evidence to support a finding of a ‘reasonable probability’ or ‘likelihood’ that the contingencies would be *288 fulfilled, then the contract’s relevance and admissibility would be established.” Little Egg Harbor, supra, 316 N.J.Super. at 281, 720 A.2d 369.
In Linwood. Properties, Inc.[26] the court concluded that the unconsummated contract “was more in the nature of an offer”, noting that “no cash was paid” as a deposit and that the contract had numerous contingencies, including the purchaser having “full discretion in determining whether an appropriate mortgage loan commitment has been issued.” Id. at 331 (emphasis added). Accordingly, the court gave it “no probative effect.” Id. at 333.
Likewise, in Sage v. Township of Bernards, 5 N.J.Tax 52, 66 (Tax 1982), aff'd, 6 N.J.Tax 349 (App.Div.), certif. denied, 97 N.J. 581, 483 A.2d 125 (1984), the Tax Court reviewed and rejected “an agreement of sale” for the subject property. Specifically, the court noted that the “buyers’ obligation to purchase [was] conditioned upon” receipt of “final [subdivision] approval”, that the contract could be extended if the final approvals were not obtained, and that “the closing was not scheduled within a reasonable time”. Id. at 67-68.
Here, although Mr. Geiger believed that the December 2008 unconsummated contract would be executed, he failed to provide testimony or evidence demonstrating that its contingencies were likely to be fulfilled. See Little Egg Harbor, supra, 316 N.J.Super. at 281, 720 A.2d 369. Moreover, Section 4.7, Section 4.9, Section 5.1, and Section 7.3 of the December 2008 unconsummated contract provided BNY with the discretion (and option) to terminate the agreement.[27]
*289 Accordingly, the court finds that the unconsummated contract is “better characterized as [an] offer[]” to sell and gives it “no weight in the valuation process.” Linwood Properties, Inc., supra, 7 N.J.Tax at 331-32.

CONCLUSION

For the foregoing reasons, Bear Brook’s property tax assessments for 2008 and 2009 are affirmed.
The Tax Court Clerk/Administrator shall issue a judgment consistent with this opinion.

 Bear Brook is designated by the taxing district as Block 1802, Lot 8.02; Block 1802, Lot; Block 1803, Lot 5; and Block 1807, Lot 6.

 These buildings collectively have a total square footage of 18,221.

 In 2008, Fredon underwent a municipal-wide revaluation effective for the 2009 tax year.

 While the assessment remained the same despite the revaluation effective in tax year 2009, the ratio of assessed value to true value (i.e. the average ratio) changed significantly: from 50.45 percent in tax year 2008, to 100.98 percent in 2009.

 According to Gale & Kitson, Bear Brook's (pro forma) gross revenue for the 2008 and 2009 tax years was $1,572,000 (Golf Fees $1,080,000 + Pro Shop Sales $84,000 + Food & Beverage Sales $384,000 + Miscellaneous Income $24,000).

 (Golf Fees $1,080,000 X 21% = 226,800) + (Pro Shop Sales $84,000 x 10% - $8,400) + (Food & Beverage Sales $384,000 x 8.0% = 30,720) + (Miscellaneous $24,000 x 10% = $2,400) = $268,320. $262,320—(Administrative Costs 268,320 x 2.0% = $5,366) - $262,954 Net Rent.

 Mr. Geiger is responsible for supervising Gale & Kitson's 2008 and 2009 real property tax appeals, working on Bear Brook's pending Department of Environmental Protection enforcement matters, and attempting to sell Bear Brook. Mr. Geiger was a fact witness regarding Gale & Kitson’s operations and the court also accepted him as an expert in New Jersey Land Use Law and New Jersey Real Estate Transactions.

 Kitson Evergreen, L.L.C. operates as Kitson & Partners and is a real estate development company.

 Gale & Kitson's appraisal report was authored by Mr. Dugas and James Casapulla (“Mr. Casapulla”), an associate at Wellspeak, Dugas & Kane, L.L.C. When Mr. Dugas and Mr. Casapulla authored their appraisal report, only Mr. Casapulla possessed a “Temporary Visiting Practice Permit” for the State of New Jersey. Although Mr. Casapulla was not called as a witness, he was present during the trial. Mr. Dugas, whose qualifications in the field of golf course appraisals are extensive and impressive, is not a New Jersey licensed appraiser (although he is licensed in other states) and did not have a New Jersey *276 Temporary Visiting License when he co-authored Gale & Kitson’s appraisal report or when he testified. Mr. Dugas explained that he did not apply for the Temporary Visiting License since he had already received three in one year, which is the maximum number allowed. See NJ.A.C. 13:40A-3.6. Fredon objected to Mr. Dugas serving as Gale & Kitson’s expert since he was not licensed. Given the court's decision in this matter based upon the sufficiency of the proofs offered, it is not necessary to reach the issue of whether a witness must possess a license or certificate under N.J.S.A. 45:14F-21 in order to serve as an expert. See arguendo Comment 2 to N.J.R.E. 702 ("The long-standing dogma has been that it is within the discretion of the trial court as to whether to qualify an expert").

 Mr. Lamicella is a certified appraiser in New Jersey that has appraised in excess of 25 golf courses in his career. Mr. Lamicella as an expert appraiser. Appraisal Systems, Inc. performed Fredon’s revaluation.

 When Gale & Kitson purchased Bear Brook, it had to complete the construction of residences in the surrounding area. These residences are not part of the instant appeals; however, Gale & Kitson believed the residential project would be successful enough to sustain Bear Brook until the golf course was self-sufficient.

 Mr. Geiger also testified that environmental restrictions exist on Bear Brook (i.e. wetlands, transition areas). Gale & Kitson has a history of self-reporting encroachments and working to remedy such issues.

 The capitalization rates listed in Gale & Kitson's pro forma analysis were: 10.5% for 2008 and 11.5% for 2009. Gale & Kitson added a tax loaded factor, bringing the final rates to: 12.35% for 2008 and 13.41% for 2009. However, in its final analysis, Gale & Kitson reduced the capitalization rate by 0.5%.

 The Marshall & Swift Cost Estimators 2007 and 2008 were utilized (and provided as an appendix to Fredon’s appraisal report).

 (2008 replacement cost $5,129,710) + (Soft cost $256,486) + (Entrepreneurial Profit $512,971)-(Depreciation $117,983) = Improvements $5,781,184. $5,781,184 Improvements + $2,745,000 Land = $8,526,000 (approx.).

 (2009 replacement cost $5,827,244) + (Soft cost $291,362) + (Entrepreneurial Profit $582,724)-(Depreciation $268,053) = Improvements $6,433,277. $6,433,277 Improvements + $2,745,000 = $9,178,000 (approx.).

 There is an "imperative need for an appraiser to verify the factual accuracy of the data relied upon to develop value estimates, as the validity of the appraiser' conclusion depends upon the accuracy of the factual data upon which it is based.” 43 New Jersey Practice, State and Local Taxation, supra, at 106; See Coastal Eagle Point Oil Co. v. Township of West Deptford, 13 N.J.Tax 242, 287 (Tax 1993), aff'd o.b. per curiam, 15 N.J.Tax 190 (App.Div. 1995).

 Furthermore, Mr. Dugas testified that he did not know whether the fixed interest rate, which is a component of the Band of Investment mortgage-equity analysis, changed or remained the same between October 2007 and October 2008 (the relevant valuation dates).

 The court takes judicial notice of this publication. It has been referenced in several published court decisions involving golf course valuations in New Jersey and nation-wide including: Procacci v. Comm’r, 94 Tax Court 397, 421 (Tax Court 1990); Wolf Creek Golf Links v. Board of County Comm'rs, 18 Kan.App.2d 263, 266, 853 P.2d 62 (Kan.Ct.App.1993); Sahalee Country Club v. Bd. of Tax Appeals, 108 Wash.2d 26, 33, 735 P.2d 1320 (Wash.1987). The Appraisal Journal states that the "income capitalization approach to value can be the most reliable indicator of value for a golf facility, especially for a daily fee course or other income-producing property." Appraisal Journal, supra, at 42 (emphasis added). However, "[t]he cost approach can be a reliable indicator of value for most types of golf facilities____” Id. at 45.

 See also Arthur E. Gimmy, MAI & Martin E. Benson, MAI, Golf Courses and Country Clubs: A Guide to Appraisal, Market Analysis, Development, and Financing 86 (1992) ("The nonprofit orientation of a golf course is, however, only the structure elected by the current owner. The facility’s future income potential can still be measured with a profit-oriented analysis to produce an accurate and appropriate value indication.").

 Given the nature of special purpose properties like golf courses, and the potential difficulty in identifying local comparable land sales, it may be necessary and acceptable to proffer out-of-jurisdiction land sales which the court may deem acceptable so long as reasonable and justifiable adjustments can be made.

 Comparable one is 11.4% the size of Bear Brook; comparable two is 11.29%; comparable three is 29.55%; and comparable four is 40.73%. See Dresser Industries, Inc., supra, 12 N.J.Tax at 166, 168 (rejecting "comparable” that were 14%-16% the size of the subject).

 “The courts have also held that adjustments of large magnitude destroy comparability." 43 New Jersey Practice, State and Local Taxation, supra, at 103; See also Township of Little Egg Harbor v. Bonsangue, 316 N.J.Super. 271, 284, 720 A.2d 369 (App.Div.1998).

 See Alpine, supra, 1 N.J.Tax at 143 (the court found “that sales of a private golf course to a municipality presents serious questions as to whether the price paid was really the same price that could be obtained in the open market for the same property").

 The court did not determine the effect on the 2009 assessment since 2009 was a revaluation year and no counter claim was filed by Fredon. The determination requires a different analysis as set forth above, and is of no consequence to the outcome of this opinion.

 "In relying on unconsummated contracts of sale in the valuation of real property two very basic and established principles must be emphasized. First, no such contract may be taken on its face without a thorough review of its provisions and the circumstances surrounding its execution. Second, when such inquiry reveals that it is replete with contingencies ... the contract must be disregarded and given no probative value." Linwood Properties, Inc., supra, 7 N.J.Tax at 333.

 Section 4.7 of the 2008 unconsummated contract, entitled 'Cancellation of Escrow', states that "[i]n the event that the Closing does not occur at the time *289 ... provided ... due to the failure of [Gale & Kitson] to comply in all material respects ... [BNY] shall have the right, as its sole and exclusive remedy, to cancel the Escrow and terminate this Agreement....” Section 4.9 also provides BNY the "option to ... terminate this Agreement” if there is "damage to or destruction" to the property in excess of $500,000. Likewise, Section 5.1 states that "[BNY] shall notify [Gale & Kitson] of any objections ... to title” and if "[Gale & Kitson] elects not to cure the defects ... [BNY] shall have the option to ... terminate this Agreement----" Lastly, pursuant to Section 7.3, if "[BNY] disapproves any Contingency Item”, which includes the "status and condition of” Bear Brook, then "in [BNY’s] discretion, [BNY] shall elect .. to terminate. ...”