**NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

## TAX COURT OF NEW JERSEY

MARY SIOBHAN BRENNAN
JUDGE



Essex County Dr. Martin L. King Jr. Justice Bldg.
495 Martin Luther King Blvd.- 4th Floor
Newark, New Jersey 07102-0690
609 815-2922, Ext. 54560

July 17, 2024

Charles Blau, Esq.
Eileen Toll, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

Thomas J. Cafferty, Esq.
Lauren James-Weir, Esq.
GIBBONS P.C.
One Gateway Center Newark,
New Jersey 07102

Re:     **City of Jersey City v. 575 Pavonia, LLC**
Docket No.:   008090-2020
Block 9606, Lot 29.01

Counsellors:

This letter constitutes the court's opinion following trial of the local property tax appeal filed by plaintiff, City of Jersey City ("Jersey City") and the counterclaim filed by defendant, 575 Pavonia, LLC[1] ("Taxpayer") for the 2020 tax year.

For the reasons stated more fully below, and based upon the specific facts of this case, the court finds that the property in question is underassessed. Furthermore, its true market value shall be established using the sales comparison approach and shall be calculated "as is" with a unit of comparison based on square footage and shall not be calculated based on potential density.

---

[1] Pleadings originally filed against prior owner/related entity 532 Summit Avenue Holdings, LLC.

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

I. Findings of Fact

A. Property Information

This appeal concerns a 19,521 square foot property[2] located at the corner of Summit Avenue and Pavonia Avenue in the city of Jersey City, Hudson County, New Jersey ("Subject Property"). Previously identified on the tax map as Block 9606, Lots 29, 32, 33, 34 and 35, in 2019 it was changed to Block 9606, Lot 29.01. The street address is 532 Summit Avenue.

By way of background, Jersey City is situated across the Hudson River from New York City and compromises part of the New York metropolitan area. It shares significant mass transit connections with Manhattan and is the second most populous city in New Jersey. The Journal Square section of Jersey City where the Subject Property is located, is a business district, residential area, and transportation hub, which takes its name from the newspaper The Jersey Journal who located its headquarters there from 1911 to 2013. The Subject Property lies one block from the Journal Square Transportation Center and PATH station, which provides direct access to Manhattan.

In late 2008, the Jersey City Municipal Council determined the greater Journal Square area to be an "area in need of rehabilitation," pursuant to the New Jersey Local Housing and Redevelopment Law (N.J.S.A. 40A:12A-1 et seq.) The creation of the Journal Square 2060 Redevelopment Plan Area followed this determination. The plan had the purpose of returning the area to a flourishing central business and shopping destination by fostering the redevelopment of Jersey City's central business

---

[2] Taxpayer's expert reported a square footage of 19,195. In the absence of evidence to the contrary, the court accepts Jersey City's reported square footage.

district. It provided for transit-oriented development of new housing, offices, commercial spaces, and public open spaces within walking distance of Journal Square and transit facilities.

The Subject Property is located within the boundaries of Zone 3 of the Journal Square 2060 Redevelopment Plan. The specific permitted uses[3] within Zone 3 are as follows:

(a)     Residential: permitted everywhere except on the ground floor of buildings greater than 65 feet in height.
(b)     Retail Sales of Goods and Services/Financial Services.
(c)     Offices: permitted everywhere except on the ground floor of buildings greater than 65 feet in height.
(d)     Houses of worship: Permitted everywhere except on the ground floor of Buildings.
(e)     Art galleries.
(f)     Live/Work units and home occupations: except on the ground floor of buildings greater than 65 feet in height.
(g)      Restaurants: category one and two.
(h)     Structured Parking: provided the design standards of Section IV: D above are met. Structured Parking is not permitted at any street corner location.
(i)     Hotels/Bed and Breakfast.
(j)     Medical Offices.
(k)     Child and Adult Day Care Centers.
(l)     Theatres/Night Clubs/Bars.
(m)      Schools.
(n)      Museum.
(o)     Government uses.
(p)     Billboards: as per billboard requirements in Section VII: E above.
(q)     Any combination of the above.

On March 30, 2015, 532 Summit Avenue Holdings, LLC purchased the Subject Property from Hugh A. McGuire, Jr.[4] and Marie McGuire, husband and wife (as to 50% interest), and Dr. Cataldo Cacaca, Carolina Topolewski, and Teresa Tripodi, tenants in common (as to a 50% interest)

---

[3] Based upon the comparable sales provided, there are multiple zones in Jersey City that provide for multi-unit residential redevelopment.

[4] Mr. McGuire, Jr. is well known to the litigants' attorneys and expert appraisers, and to the court. He has an MAI designation (Member Appraisal Institute) and has testified as an expert in the valuation of commercial, industrial, residential, and other types of property.

for $5,050,000 (five-million-fifty-thousand dollars), which calculated to $258.70 per square foot.

At the time of sale, and until 2020, the Subject Property consisted of an active commercial parking lot with 100+ on-site spaces on a .44-acre lot. Only one building existed on the lot; a small station for the parking attendant. The remainder of the site consisted of asphalt pavement, concrete curb-cuts, concrete sidewalks and curbing, fencing, metal guard rail/barriers, lighting, and signage. Surface parking as a principal or accessory use is not a permitted use in Zone 3. Thus, on the valuation date for 2020 local property taxes, October 1, 2019, the Subject Property's existing parking lot constituted a pre-existing non-confirming use.

B. Site Plan Approval

On August 15, 2019, Taxpayer applied to Jersey City's Planning Board ("Planning Board") for Preliminary and Final Major Site Plan approval with design waivers and deviations pursuant to N.J.S.A. 40:55D-70(c). The application related to the development on the Subject Property of a twenty-five-story mixed use building, with approximately 2,416 square feet of retail/restaurant/sidewalk cafe space on the ground floor; approximately 1,631 square feet of office space on the ground floor; and 341 residential units on the upper floors.[5]

On October 29, 2019, the Planning Board heard Taxpayer's amended application[6] with four design waivers and ten deviations. At the hearing, Taxpayer presented the testimony of four witnesses including experts in support of its application. There was no expert testimony presented in opposition to the testimony and reports provided by Taxpayer's witnesses and experts. There were members of the

---

[5] Remaining square footage is presumed to be for setback, step back requirements, etc. as required by zoning.

[6] Taxpayer amended the application at the hearing to include a dog run on the second level which resulted in the elimination of a residential unit.

public who attended and expressed concerns. Also, a member of the public representing the adjoining church property spoke in favor of the redevelopment.

Relying on the testimony, plans, and reports submitted by Taxpayer's witnesses and experts, the oral and written testimony of the Division of Planning Staff, and the comments of the public, the Planning Board approved the application at the October 29th meeting by an 8-1 vote, subject to certain conditions, through the adoption of a Resolution. That Resolution (P19-131) was memorialized on November 26, 2019.

Shortly thereafter, on December 19, 2019, 532 Summit Avenue Holdings, LLC transferred title to the Subject Property to Taxpayer for $10.00 (ten dollars). Additionally, the parties entered into a contractual agreement that would allow the parking facility to continue in operation until such time as the development project could break ground.

Resolution P19-31 was amended in 2020 by way of Resolution P20-113 to make material changes, adjust the unit mix, and make several other changes. In 2021, Taxpayer applied for Final Major Site Plan Administrative Amendment Approval to include a reduction in the number of residential units from 340 to 317, façade changes, reconfiguration of the cellar space, and shifting of the east foundation wall. The Planning Board heard the application on September 14, 2021. The Planning Board approved Taxpayer's application by a 5-0 vote. That Resolution (P21-090) was memorialized on September 28, 2021.

C. Assessment History

Jersey City conducted a city-wide revaluation in 2018.[7] As a result of the revaluation, the Subject Property carried an assessment value of $1,500,000 (one-million-five-hundred-thousand

---

[7] Revaluation is the process of updating the tax assessed values (what the city uses to compute property tax bills) to equal market values (what a property is worth on the open market).

dollars) for tax years 2018-2021. For tax year 2022, the assessment was increased to $18,800,000 (eighteen-million-eight-hundred-thousand dollars), of which $18,700,000 (eighteen-million-seven-hundred-thousand dollars) was attributed to the land value and $100,000 (one-hundred-thousand dollars) was attributed to the value of improvements.

This appeal applies to tax year 2020. Set forth below are the Subject Property's local property tax assessment, implied equalized value, and the experts' value conclusion in controversy.

| Valuation date | Local property tax assessment | Average ratio of assessed to true value | Implied equalized Value | Jersey City's expert's concluded value | Taxpayer's expert's concluded value |
|---|---|---|---|---|---|
| 10/1/2019 | $1,500,000 | 87.91% | $1,706,300 | $27,200,000 | $7,580,000 |

D. Procedural History

On June 10, 2020, Jersey City filed with this Court a direct appeal of the Subject Property's tax assessment for the 2020 tax year. On June 29, 2020, Taxpayer filed an Answer and Counterclaim. After the conclusion of discovery, the court held trial on May 16, 2024. At the conclusion of testimony, documents were moved into evidence. In lieu of closing arguments, the parties submitted closing briefs.

E. Trial Testimony

Jersey City offered testimony from a New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation ("Jersey City's expert"). The expert testified that the most credible method of determining the true market value of the Subject Property is through use of the sales comparison approach. He prepared an

6

appraisal report expressing his opinion of the Subject Property's true or fair market value as of the October 1, 2019 valuation date.[8]

Jersey City's expert relied on six land sales zoned for development in Jersey City. The expert restricted his sales primarily to properties that had been sold subject to site plan approval or sold with existing site plan approvals. Two of the chosen properties were also used as comparable sales by Taxpayer's expert (70 Central Avenue and 348 Baldwin Avenue, both of which were sold subject to approval.) The expert categorized Taxpayer's August 2019 application for preliminary site plan approval as "imminent" prompting him to apply a density-based unit of comparison of price per unit, which he believed was in accord with New Jersey jurisprudence specific to the development of vacant land.

The comparable sales covered the period from May 31, 2018 through August 20, 2019. Adjustments were made for expenditures after purchase, market conditions, location, size, and development approvals. After adjustments, the sales ranged in value from $71,916 to $103,481 per market unit. The sales had a mean of $82,882 per unit and a median of $79,826 per unit. After careful consideration of all the pertinent factors, the expert concluded that, while no sale can be considered conclusive, it was his opinion that the combined weight of all sales provided support for a land value estimate of $80,000 per market unit. When multiplied by 340 units, he opined that the fair market value of the Subject Property, as of October 1, 2019 was $27,200,000.00 (twenty-seven-million-two-hundred-thousand dollars.)

---

[8] Jersey City's expert amended his November 30, 2023 report on May 15, 2024 to reflect a few minor corrections to his comparable sales.

Taxpayer presented three witnesses at trial. Taxpayer offered testimony from a New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation ("Taxpayer's expert.") Taxpayer's expert agreed that the most credible method of determining the true market value of the Subject Property is through use of the sales comparison approach. Taxpayer's expert prepared an appraisal report expressing his opinion of the Subject Property's true or fair market value as of the October 1, 2019 valuation date.[9]

Like Jersey's City's expert, he focused on vacant properties and properties to be demolished in one of Jersey City's multiple redevelopment zones. However, unlike Jersey City's expert, Taxpayer's expert unit of comparison was based on a value per square foot, which he believed more accurately reflected the market's valuation of development properties without preliminary site plan approval in Jersey City.

The comparable sales employed by Taxpayer's expert covered the period from October 2017 through October 2019. He adjusted for expenditures after purchase, market conditions, location, size, and development approvals. After adjustments, the sales range in value was from $226.69 per square foot to $457.52 per square foot. The sales had a mean of $345.82 per square foot and a median of $340.97 per square foot. The expert concluded that upon review of all sales information pertaining to vacant sites in the Journal Square area, and considering the multitude of factors that influenced each individual sale, the Subject Property was in the middle range of adjusted value. He attributed this to its overall size, lack of approvals as of the date of valuation, shape, location, physical site characteristics and zoning. It was his opinion that the combined weight of all sales provided support for an "as is" land value estimate of $395.00 per square foot, which multiplied by 19,195 square feet

---

[9] Taxpayer's expert amended his February 8, 2024 report on May 15, 2024 to reflect a few minor corrections to his comparable sales.

results in a value of $7,582,025. After rounding, he found the fair market value of the Subject Property, as of October 1, 2019, was $7,580,000 (seven-million-five-hundred-and-eighty-thousand dollars.)

A representative of the Taxpayer, real estate developer Joseph Panepinto also testified. He has been a partner in Ironstate Development Company for 25 years. His primary job responsibilities involve acquisition of properties and financing almost exclusively in Jersey City. He negotiated the successful bid on the Subject Property with prior owner, Hugh Maguire, Jr. in 2015. He also testified as to his involvement with another Zone 3 redevelopment project near the Subject Property known as Columbus Towers. Specifically, he recounted the difficulties in obtaining site plan approval for that project due to issues and objections from members of the city council, the city's engineering staff, and members of the public. The delays and difficulties in that matter were only resolved after almost three years of litigation in both state and federal court.[10]

_____

[10] On September 25, 2018 the Property Owner filed a Verified Complaint captioned 500 Summit Avenue Mazal, LLC v. City of Jersey City, Annisia Cialone, Director, Jersey City Department of Housing, Economic Development and Commerce, Tanya Marione, Director, Division of City Planning, Matthew Ward, Principal Planner, Raymond Meyer, Construction Code Official, Jersey City Department of Public Works, and John and Jane Does 1-10, Docket Number HUD-L-3805-2018. The First Count sought a court order by way of a prerogative writ in lieu of mandamus to compel various officials and agencies of Jersey City to both recognize and act upon the Property Owner's building permit applications because of an "automatic approval" pursuant to N.J.S.A. 40:55D-10.3 and Section 345-13 of the Jersey City Land Development ordinance regarding the development and construction of real property located at 500 Summit Avenue.

On October 24, 2018, Jersey City filed a Notice of Removal of the case to U.S. District Court for the District of New Jersey under Civil Action No. 2:18-cv-15276-JMV-JBC predicated upon federal claims set forth in the Second Count of the Complaint.

In 2020, the parties along with representatives of the Hilltop Neighborhood Association, including residents living near the property, engaged in settlement negotiations, resulting in the dismissal of the actions without prejudice.

Following Mr. Panepinto's testimony, Taxpayer offered testimony from a New Jersey licensed professional planner, who was accepted by the court, without objection, as an expert in the field of municipal planning board procedures and approvals ("Taxpayer's planning board expert").[11] Taxpayer's planning board expert addressed the uncertainties of municipal planning board approvals as of October 1, 2019, based upon her experience in appearing before the Planning Board of Jersey City, and other planning boards. Taxpayer's planning board expert prepared a report expressing her opinion that while a likelihood existed that site plan approval would be obtained, as of the October 1, 2019 valuation date, approval had not yet been obtained, timing of approval was uncertain, and the possibility of a challenge to approval was unknown and uncertain.

## II. Conclusions of Law

Presumption of Validity

Original assessments are entitled to a presumption of validity. MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (N.J. Tax Ct. 1998). This presumption can be overcome "by presenting evidence sufficient to demonstrate the value of the subject property, thereby raising a debatable question as to the validity of the assessment." Id. at 376. The evidence must be definite, positive, and certain in quantity and quality to overcome the presumption. The plaintiff bears the burden of overcoming the presumption with respect to its claim, and the defendant must overcome the presumption with respect to its counterclaim.

Taxpayer argues that Jersey City has failed to overcome the presumption of correction attached to the Subject Property's 2020 $1,500,000 tax assessment. The court finds this argument

---

[11] The expert was not involved in Taxpayer's actual preliminary and final site plan approval application process or subsequent hearings.

disingenuous at best. While the court will not speculate as to why the assessment was set at $1,500,000 at the time of revaluation, which was three years after its sale for $5,050,000, there is no question in the court's mind that the Subject Property as of October 1, 2019 was underassessed.

As established by the testimony of both expert appraisers, the Subject Property's 2020 market value is potentially between 4 ½ to 16 times higher than its implied equalized value. The court finds that the 2015 purchase price and the testimony of both experts provide sufficient evidence to overcome the presumption of validity attached to the original assessment. Having made this determination, the court must now weigh and evaluate all the evidence, decide the appeal on the merits, and determine the fair market value as of October 1, 2019.

Highest and Best Use

Pursuant to N.J.S.A. 54:4-23, the focus of an appeal of property taxes is on the market value of the property as of the first of October in the applicable pretax year. To establish market value, consideration must be given to the price which a hypothetical buyer would pay a hypothetical seller, neither of which is constrained to purchase or sell the property premised upon the property's highest and best use, either as vacant or improved.

The court bases its determination of a property's highest and best use on an analysis of four criteria: whether the use of the property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). Critical to any highest and best use analysis is that the use of the property not only be legally permitted but is reasonably probable.

A fundamental tenet of the highest and best use analysis is that property, regardless of its character, must be valued and assessed for local property tax purposes in the condition in which it is utilized on the assessing date, and the burden is on the person claiming otherwise to establish

11

differently. Generally, property should be valued for tax assessment purposes based upon what was known and reasonably anticipated as of the assessment date and should not be based upon speculation or conjecture.

On the date of valuation (October 1, 2019), the Subject Property consisted of a public parking lot located within Zone 3 of the Journal Square 2060 Redevelopment Plan. Proposed development projects in a highly populated urban area are not simple undertakings. Many factors must be considered when seeking approvals from planning boards. A proposed development must be analyzed with respect to its potential relationship with both existing buildings and proposed or foreseeable buildings in the future. The development must also be analyzed in terms of light, air, useable open space, access to public rights of way, parking and transit, and height and bulk as well.

While it is true that Taxpayer's August 2019 application to the Planning Board for Preliminary and Final Major Site Plan approval was for the development of a 25-story mixed use building, with 341 residential units (reduced to 340), it is also true that the Taxpayer's application sought four design waivers and ten deviations and had not yet endured a public hearing. Therefore, Jersey City's appraisal expert's conclusion that the highest and best use of the Subject Property is for development of multi-family residential use with a 25 story, 340-unit apartment building, as permitted by zoning and approved by the Jersey City Planning Board, simply could not have reasonably been made on October 1, 2019. This conclusion "jumps the gun" and assumes that Taxpayer's application as written in August 2019 is an "imminent" given or, colloquially a "done deal". Jersey City's appraiser overlooks the multitude of factors common to the application, hearing, and resolution process that could have prevented the October 29, 2019 approval and/or November 26, 2019 memorialization from occurring.

12

With respect to a fully developed urban environment, such as Jersey City, an application without a hearing is merely just that – an application. Despite the zoning, the proposed development has not been subjected to review and scrutiny by the planning board members and the public. It is their function to oversee redevelopment of their community. The planning board is entitled to consider, object, question, remand, and potentially adjourn the decision on approval to protect their community from random, non-comprehensive redevelopment even within permitted zoning. Although high density multifamily residences are, in fact, permitted by the applicable zoning, the actual density to be approved was an unknown factor until after preliminary site plan approval was obtained.

Sales in the market reflect this. To manage risk, developers often contract to buy property subject to approval rather than "as is." In fact, of the six comparable sales submitted by Jersey City's expert, three were sold subject to approvals, and two were sold with approvals. Many pending conditional sales never close because they are subject to approvals that could not be obtained within a developer's desired time frame or could not be obtained at all.  As stated recently by our Appellate Division, "As is the case here, there are often many steps a prospective redeveloper must undertake before being considered for preliminary site plan approval on a redevelopment project." See Sackman Enters., Inc. v. Mayor, 478 N.J. Super. 68 (App. Div. 2024).

Taxpayer's planning board expert's testimony and report highlight the uncertainty that attaches to a pending site plan approval application, and the speculative nature of the timing and scope of any approval that is ultimately granted. She credibly presented a multitude of factors that can delay, or even derail, a land use application.

Firstly, any interested party has standing to challenge the notice of hearing.  If such a challenge is rendered, and the board attorney finds that the notice is defective, the hearing must be adjourned

13

to a future date to allow for the publication and/or mailing of a cured notice. Additionally, any meeting that fails to comply with the Open Public Meetings Act, N.J.S.A. 10:4-1, et seq., must be postponed. Further, weather, and other inclement factors can lead a planning board to postpone a previously and properly noticed hearing. The board may also postpone a hearing to secure a larger room if the number of people in attendance exceeds the hearing room's maximum occupancy.

Secondly, an application may be placed on a hearing agenda, but not reached due to the volume of the agenda. Specifically, as to Jersey City, the planning board expert related that the planning board is known for having numerous applications on its agenda at each hearing. Further, a majority of board membership is required to be present for a planning board to reach a quorum and conduct business. A meeting may not proceed if quorum is not reached. Moreover, conflicts of interest may render the quorum inadequate for a specific application. Even if a quorum is reached, if it is at the minimum required attendance, an applicant may seek to carry the matter to a later date to ensure more board members are present to review the application.

Thirdly, the planning board may need to allow additional time for public comments and hearings. An applicant has the right to call as many fact and expert witnesses as necessary. Likewise, all interested parties are entitled to ask questions and/or cross-examine each witness. Interested parties are also permitted to provide testimony and call their own witnesses. The applicant is then permitted to question and/or cross-examine all persons who testify. During an application presentation, it is typical for board members and/or board professionals to request additional information that is necessary to render a decision, including but not limited to, information related to operational aspects of a use, additional plans/drawings or a redesign, and additional expert testimony. A board might also request its own professionals to prepare additional analyses beyond an initial review that would require a mater to continue to another hearing.

14

Lastly, the planning board may also decide to reserve decision on a matter after the hearing is completed and make its decision at a subsequent meeting. If a variance is being requested, objectors can request a continuance of a hearing to secure counsel and develop a case in opposition to the requested variance. An applicant or an objector can also appeal a decision of the planning board. The appeal process can be lengthy and sometimes ties up a land-use matter for years.

The above factors are neither imaginary nor remote. Taxpayer's representative testified as to the three-year litigation delay from 2017 through 2020 with respect to the Columbus Towers project located just one block away from the Subject Property.

Taxpayer's expert takes these factors into account expressly stating:

[i]t is my opinion that the highest and best use of the subject site "as vacant" and "as improved" is for the subject to be redeveloped for residential apartment use. The subject's current use [10/01/2019] is on a short term interim basis to be used as a parking lot but ultimately redevelopment of the parcel is likely and the most probable future use. It is noted that site plan approval is anticipated in future years based on various proposals/site plan submissions from the current owner. All of the 4 tests of the highest and best use are completely satisfied.

Thus, the value attributed to the Subject Property by Taxpayer's appraiser appropriately considers that, as of October 1, 2019, while they anticipated approval, no approval had yet been obtained, the timing of any approval was uncertain, and the possibility of a challenge to an approval was unknown and uncertain. All these factors would have affected the purchase price that a hypothetical buyer would have paid for the Subject Property on October 1, 2019.

The court accepts Taxpayer's highest and best use analysis as the more accurate and correct method to determine valuation of the Subject Property.

Unit of Comparison

Sales comparison is the most common technique for valuing vacant land and the court agrees with the experts that it is the most appropriate method to value the Subject Property. The true

discrepancy between the two appraiser's opinions of value involves the appropriate unit of comparison to be used when comparing sales. Jersey City's expert used the price per developable unit that can be constructed on the site, while Taxpayer's expert used the value per square foot.

As to this issue, the Appraisal Institute text on land valuation states as follows:

> The price per square foot of potential building area (also known as the price per floor area ratio or FAR) is appropriate to use when the amount of building space allowed by zoning for a particular use greatly influences property value. One measure of a zoning density is the number of square feet of building area that can be constructed on the site. This measure of allowable floor space generally relates to land zoned for office or industrial uses, while another density measure governs the number of apartment units that the zoning will allow on a parcel.
>
> [Land Valuation, Real Solutions to Complex Issues. Chicago: Appraisal Institute,2022 (p. 44).

and

> The price per buildable unit is appropriate to use when the allowable number of apartment units per acre or the number of apartments the entire parcel will support (either gross or net acres) provides the basis for the indicated value. Investors buy land based on how many apartments can be built rather than the number of acres a parcel may contain. … The unit price varies depending on the usual physical features, the probable rental rate of prospective apartments, and how far the parcel has progressed in the zoning and site planning process.
>
> [Land Valuation, Real Solutions to Complex Issues. Chicago: Appraisal Institute,2022 (p. 55).

The critical date here is October 1, 2019. As of that date, the reasonably probable use of the Subject Property was redevelopment that results in the highest value in conformance with the permitted uses of Zone 3 of the Journal Square 2060 Redevelopment Plan. However, without preliminary site plan approval, the specifics of redevelopment and the density measure of apartment units, which would provide the highest and best use as of October 1, 2019 were not known at that

16

time and were not known within a reasonable probability. This truth is exemplified by the Columbus Towers litigation, which as of October 2019 had been in active litigation for over a year (settlement did not occur until 2020).

Subsequent approval on October 29, 2019 does not change that reality. As of October 1, 2019, while there was a reasonable probability that redevelopment of some measure of density would be approved at some point in the future, there lacks reasonable probability of approval sufficient to warrant valuation of the property on October 1, 2019 as if the density measure indicated in the application had been approved.

This court finds that as to the Subject Property, a current opinion of market value that reflects the existing redevelopment zoning and any premium that market participants would pay because of the likelihood of future site plan approval is an "as is" value. Market value would not be based on speculation, hypothetical conditions, or unsubstantiated assumptions.

Jersey City argues that using a density-based unit of comparison comports with multiple prior Tax Court decisions.

In Sage v. Bernards Twp., 5 N.J. Tax 52 (1982), the Tax Court valued 292.80 acres of land for $5,490,000 based on the conclusion that it could support 1,098 single family lots, at a value of $5,000 per lot. The lots under appeal, together with various other lots in the township, were the subject of much zoning litigation for many years, relating to a ruling that the municipality's three-acre minimum lot size zoning in the southeastern quadrant of the township (which included the subject properties) was invalid. The plaintiffs alleged that the assessor markedly increased the 1980 assessments based mainly upon its rumored sale and the subject properties' rezoning from minimum three-acre dwelling lots to multi-family. They complained that since the new zoning ordinance did not receive its final reading and approval until October 2, 1979, one day after the assessing date, and,

17

since the agreement of sale was dated October 17, 1979, which was also after the assessing date, the assessor had no legal reason for increasing the assessments.

The county board affirmed the assessment, and the court affirmed the judgment of the county board. The court noted that the value of a property, pursuant to N.J.S.A. 54:4-23, was the price which the assessor believed could be obtained for the property, in money, at a fair sale, between a willing seller and a willing buyer, as of the first day of October of the year in which the assessment was made. The local assessor had the authority to use his knowledge and judgment in valuing taxable property, and he was not confined by the law to base his value on recorded deed transactions. Additionally, so long as a proffered sale was not remote, the sale of the subject property occurring shortly after its assessing date was admissible for its rational probative valuation inference. The court found that the assessor had followed the statutory directives, and the evidence supported his valuation.

The court finds the facts presented in Sage, distinguishable from those in this appeal. The assessment in Sage related to a lengthy and highly litigated process to rezone development for residential use in a rural community as set forth in specificity in the development plan (The plan will consist of 1,222 units, 1,016 of which will be multi-family, 206 of which will be single-family residences.) Thus factually, the Sage case bears little resemblance to the factual scenario presented by Jersey City's redevelopment plan because there exists no reasonable knowledge of approval or specificity.

Jersey City notes that in Berkley Arms Apartment Corp. v. Hackensack City, 6 N.J. Tax 260 (1983), the court held that, generally speaking, the size of a lot bears no necessary relationship to the number of units that can be place on a property which is controlled by the applicable zoning, bulk, and height requirements. However, the use of this holding is taken out of context.

18

Berkley Arms was an existing mid-rise apartment building consisting of 120 units, situated on approximately 1.56 acres. There were 60 one-bedroom and 60 two-bedroom apartments with each unit being virtually identical to all others in the same bedroom category. The improvements, which were constructed in 1954-1955, consisted of an eight-story complex with a two-story reinforced concrete parking structure containing 126 parking spaces and an in-ground concrete pool. The property was conveyed on April 28, 1981, to convert ownership from income-producing to cooperative ownership. Since it remained a multi-family residential use property, this ownership conversion did not change the highest and best use ascribed to the property in any way. Factually, the Berkley Arms case is completely distinguishable from the Subject Property, which involves vacant land to be improved in an urban redevelopment zone.

In Linwood Props., Inc. v. Fort Lee Borough, 7 N.J. Tax 320 (1985) the subject property was a 5-acre vacant lot. It was zoned R-10, which permitted the construction of high-rise-residential buildings with a maximum height and number of units that depended on the size of the lot. The two experts relied on a total of seven sales all of which were zoned for high rise apartment buildings. No new high-rise apartment buildings had been built in many years. There were no approvals in place for the subject property. The defendant's expert analyzed the sales based on the number of apartment buildings permitted under the zoning ordinance. The municipality's appraiser based his value on the square footage of the subject. The Tax Court rejected the square footage analysis. The Court found that the subject could accommodate 276 apartment units in a 15-story building and found a value of $12,325 a unit.

Like Jersey City, Fort Lee is situated in one of the premier high-rise-apartment communities in the northern part of New Jersey. Residents have instant access to New York City by way of the George Washington Bridge. Additionally, occupants of high-rise structures particularly enjoy the

view of the New York City skyline. The property's R-10 zoning permitted the construction of high-rise-residential buildings with the maximum height and number of units dependent upon the size of the lot. It is in very close proximity to the George Washington Bridge and is immediately accessible to public transportation facilities.

According to Fort Lee's expert witness there were approximately 125 apartment structures of significance in the borough. The site was one of four remaining vacant sites in the borough zoned for such use. No new high-rise-apartment buildings had been constructed in the borough for many years (the proliferation of condominium and cooperative apartment units resulted from conversions of rental apartment buildings).

The court in arriving at its decision stated:

> It is not the mere opinion of appraisers as to highest and best use that is important but rather the activities of buyers and sellers in the market place. Without purporting to set forth all of such factors, some of the more significant to be considered in determining highest and best use may be the rezoning of nearby property, growth patterns, change of use patterns and character of neighborhood, demand within the area for certain types of land use, sales of related or similar properties at prices reflecting anticipated rezoning and physical characteristics of the subject and of nearby properties.

[Linwood at 327-328]

These exact types of factors distinguish the holding in Linwood from the Subject Property. The property in Fort Lee was being developed with a focus on the use of one of four remaining vacant lots in the borough. Jersey City's expansive redevelopment plan runs counter to that. Jersey City's plan is based upon a broad "area in need of rehabilitation," and encompasses a large section of the municipality, which is geographically much denser and larger than Fort Lee. The court was not concerned with site plan approvals in Linwood. Rather, it focused on a highest and best use determination based upon a potential variance or zoning change to allow for the development of office

20

space. It's determination of unit of comparison related to those factors which are different than the factors involved with the Subject Property.

Likewise, this court finds the factual scenarios in <u>Romulus Development Corp. v. Weehawken Tp.</u>, 15 N.J Tax 209 (1995) and in <u>Jersey City, Div. of Water v. Parsippany-Troy Hills Tp.</u>, 16 N.J. Tax 504 (1997) distinguishable from the market factors present in Jersey City in October 2018-2019. An educated buyer and an educated seller would not have assumed that Preliminary and Final Site Plan approval at the density requested in the application would be imminent or forthcoming. Such instability would have driven the purchase price and the computation of value.

Evidence of this is found in the history of the Subject Property as presented in the record. The Subject Property has been in Zone 3 of the Journal Square 2060 Redevelopment Plan since approximately 2010. It is apparent that with the existing zoning in place for almost five years, the 2015 purchase price of $5,050,000 was not based upon a density unit of comparison. Likewise, the 2018 revaluation figure of $1,500,000 was not based on a density unit comparison. In fact, it would appear that the Jersey City assessor did not value the Subject Property based on a per unit density comparison until October 1, 2021, when the land portion of the assessment was increased to $18,700,000.

Accordingly, the court accepts Taxpayer's highest and best use analysis as the more accurate and correct method to determine valuation of the Subject Property. The court rejects Jersey City's methodology to determine valuation based upon a density analysis and accepts Taxpayer's methodology based upon square footage.

<u>Valuation</u>

Of the properties presented by both experts, and incorporating a square footage unit of

21

comparison, the court relies upon the comparable sales of 70 Central Avenue[12] and 348 Baldwin Ave[13], which were provided by both Jersey City and Taxpayer; as well as the Taxpayer's comparable sales of 711 Montgomery Street, 425 Hoboken Avenue, and 175-177 Academy Street; and Jersey's City's comparable sale at 55 Jordan Avenue. The court accepts the adjustments made by Taxpayer's expert for market conditions, size, physical characteristics, corner influence v. non-corner and status of approvals as credible. Since 55 Jordan Avenue sold with approvals, the court applied a 20% negative adjustment for the property.

The adjusted range of value is $226.69 per square foot to $538.42 per square foot. The adjusted mean value is $385.55 per square foot and the adjusted median is $382.55 per square foot; however, the court finds that the Subject Property is in the high range of the adjusted value due to its density potential and its proximity to the Journal Square Transportation Center.

After weighing the evidence, the court determines that the Subject Property had a true market value of $450 per square foot as of October 1, 2019. This conclusion results in a true market value of $8,784,450 ($450 x 19,521), which the court will round to $8,785,000.

Corrected property tax assessment

Having reached a conclusion of the Subject Property's true or fair market value for the 2020 tax year, the court will determine the correct assessment. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the

---

[12] The court accepted Taxpayer's square footage of 11,395 square feet as opposed to Jersey City's square footage of 12,458 square feet.

[13] The court accepted Jersey City's square footage of 9,148 square feet as opposed to Taxpayer's square footage of 10,157 square feet.

upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| True market value | x | Average ratio | = | Revised taxable value |
|---|---|---|---|---|

For the 2020 tax year, the ratio of total assessed value, $1,500,000, to true market value, $8,785,000, yields a ratio of 17.07% which falls below the lower limit of the Chapter 123 common level range for Jersey City (74.72%). Consequently, the total assessment calculation for the Subject Property is:

$$\$8,750,000 \quad x \quad .8791 \quad = \quad \$7,692,000 \text{ [ROUNDED]}$$

III.  Conclusion

For the reasons expressed above, the court finds that the Subject Property is underassessed, and that its true market value when calculated "as is" on a square footage unit of comparison is $8,785,000.

/s/ Mary Siobhan Brennan, J.T.C.

Contemporaneously with the issuance of this opinion, the court is entering final judgment for the 2020 tax year appeal.